807 S.E.2d 206

**The STATE, Respondent,**

v.

**Derek Vander COLLIER, Appellant.**

**Appellate Case No. 2015-000184**
**Opinion No. 5518**

Court of Appeals of South Carolina.

Heard April 12, 2017
Filed October 4, 2017
Rehearing Denied December 7, 2017

428

John Lafitte Warren, III, of Simmons Law Firm, LLC, and Chief Appellate Defender Robert Michael Dudek, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General William Frederick Schumacher, IV, both of Columbia; and Solicitor Jimmy A. Richardson, II, of Conway, all for Respondent.

LOCKEMY, C.J.:

Derek Vander Collier appeals his conviction for second-degree burglary, arguing the trial court improperly limited his closing argument, erred in allowing the State to play recordings of two police interviews, and should not have allowed a witness to identify him in front of the jury. We affirm.

**FACTS AND PROCEDURAL HISTORY**

On November 20 and 21, 2013, the Jamaican Motor Inn in Myrtle Beach, South Carolina, was closed to visitors because

the room doors were being repainted. Justin Kirkman, one of the subcontractors hired for this task, stayed in the penthouse on the fifth floor of the motel during the night to check the doors at thirty-minute intervals and close them when the paint dried.

During the early morning hours on November 21, while Kirkman was in the penthouse between rounds, he heard a suspicious sound coming from another floor. Kirkman took the motel elevator to the third floor, where he noticed the light in one of the rooms was on even though he had turned off all the room lights. Kirkman went to that room and saw a man attempting to remove a television from the wall of the room.

According to Kirkman, when he confronted the stranger, the man drew what appeared to be a semiautomatic handgun and fled the room to the first floor of the motel. Despite the brevity of the encounter, Kirkman observed the man face-to-face at a close distance for ten to fifteen seconds. Furthermore, the light in the motel room was on during the confrontation, and although the man wore a hooded sweatshirt, the hood was down during their encounter.

Kirkman followed the man to the parking lot and saw him drive away in a four-door sedan from the late 1990s or early 2000s. Kirkman saw no other occupants inside the car but noticed a television in the back seat. Kirkman chased the car in an unsuccessful attempt to get the license tag number. After returning to the third floor and noticing one of the rooms was missing a television, Kirkman called the police.

About a week after the incident, Kirkman went to the police station to meet with an artist, who prepared a computer sketch of the suspect based on his description. Later, Kirkman viewed a photo lineup. After viewing the lineup, Kirkman narrowed his selection to two photos. Although he was "leaning towards" one of the two, he could not make a positive identification because of the poor quality of the images and his reluctance to implicate the wrong person. However, Kirkman also told the police he was certain he would recognize the suspect in person.

On January 29, 2014, Brian Truex, who was then a violent crimes detective with the Myrtle Beach Police Department, recognized Collier on the street. Truex attempted to contact

Collier because he recognized Collier was facing numerous burglary charges. Initially, Collier attempted to evade arrest by giving Truex a false name, but the police confirmed his identity, arrested him, and transported him to the Myrtle Beach Police Department for an interview.

Truex conducted Collier's first police interview, which began five to ten minutes after his arrest. Before receiving *Miranda*[1] warnings, Collier informed Truex he had smoked crack cocaine a short time earlier[2]; however, he did not appear to be under the influence of any drugs and was eager to proceed with the interview. Collier had only a tenth-grade education, but he was articulate and able to answer Truex's questions in an appropriate manner, providing specific and incriminating details about the burglaries for which he was being investigated. During the interview, Collier admitted to burglarizing various area hotels but claimed he did this to help his mother, who he claimed was having financial problems. Collier also revealed his method for removing televisions from hotel rooms and acknowledged he had been at the Jamaican multiple times, an admission supported by specific information that Collier provided about the hotel and surrounding landmarks.

Carol Ann Allen, a property crimes detective with the Myrtle Beach Police Department, conducted the second and third interviews of Collier on January 30 and 31, 2014. Collier discussed the November 21 incident at the Jamaican during the third interview, which took place at his request. Although Collier denied pulling a gun on Kirkman, he indicated he was the individual whom Kirkman encountered.

On April 24, 2014, Collier was indicted on one count of second-degree burglary and one count of possession of a weapon during the commission of a violent crime. The State called the case to trial on December 8, 2014.

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. According to Collier, he "had smoked like four to five minutes before they arrested [him]"; however, Truex testified Collier "stated he had smoked crack approximately forty-five minutes prior to the interview."

After a jury was selected, the trial court held *Jackson v. Denno* [3] hearings to determine the admissibility of recordings of the first and third interviews. Over Collier's objections, the trial court ruled the recordings of both interviews admissible with appropriate redactions.

Based on assurances from the State that it would not ask Kirkman to identify Collier in front of the jury, the trial court did not hold a *Neil v. Biggers* [4] hearing. However, during the State's case-in-chief, Kirkman, the first witness to testify, was asked if the person he saw attempting to dismount a television from a hotel room wall was "in the courtroom." Because a *Neil v. Biggers* hearing had not taken place, the trial court declared a mistrial.

A different jury was selected, and the State called the case to trial the next day. The court held an in camera *Neil v. Biggers* hearing and ruled, over Collier's objection, Kirkman could make an in-court identification of Collier in front of the jury.

Among the concerns expressed by the defense to Kirkman's in-court identification of Collier was Kirkman's presence in the courtroom during the *Jackson v. Denno* hearing the previous day, during which audio recordings of Collier's interviews were played.[5] The defense, however, did not question Kirkman or any other witness about what Kirkman saw or heard during

3. *See Jackson v. Denno,* 378 U.S. 368, 376-77, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (stating a defendant in a criminal proceeding has the "constitutional right ... to object to the use of [a] confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession").

4. *See Neil v. Biggers,* 409 U.S. 188, 198-99, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (requiring the trial court to determine whether an out-of-court eyewitness identification of a criminal defendant is admissible based on (1) whether the identification resulted from unnecessary and unduly suggestive procedures and (2) if so, "whether under the 'totality of circumstances' the identification was reliable" notwithstanding the suggestive identification procedures).

5. The defense made no contemporaneous objection to Kirkman's presence in the courtroom during the *Jackson v. Denno* hearing because that hearing took place during the first trial, when the State mistakenly informed the trial court it would not ask Kirkman to make an in-court identification.

the *Jackson v. Denno* hearing or whether his presence in the courtroom during the hearing affected his ability to make an impartial in-court identification.[6]

During the State's case-in-chief, Kirkman revealed on direct examination he was currently on probation for burglary and non-aggravated charges from Colorado. On cross-examination, defense counsel pointed out possible inconsistencies between what Kirkman claimed he told the police about the car that he saw leaving the Jamaican and the description of the vehicle in the police report. The State then requested to play a tape of Kirkman's statement to the police as a prior consistent statement. The defense objected, asserting "[i]t would just be bolstering testimony by the State" but indicated it would agree to playing the recording of "those specific questions."

The trial court noted Kirkman was asked specific questions about what he told the police and informed counsel it would grant the State's request if the defense intended to argue to the jury that Kirkman had an improper motive to fabricate his testimony and was "lying to save himself from going back to jail." Defense counsel conferred with Collier and advised the court Collier would not make this argument. Based on this assurance, the trial court denied the State's request.

Recognizing a "continuing objection by the Defense," the trial court allowed Kirkman to identify the artist's sketch made according to his description. Kirkman also identified Collier in front of the jury. The trial court also allowed the State to publish recordings of the first and third interviews to the jury.

The defense rested without presenting a case-in-chief, and the trial proceeded to closing arguments. When presenting its closing argument, the State pointed out Kirkman was still on probation and argued, "If [Kirkman] were to be convicted of lying to the police or lying to the [c]ourt, he could go to jail, he could go to prison. He has a lot of incentive to tell the

---

6. The State noted Kirkman was in the courtroom for only a few minutes and the limited part of the recording that he heard did not include any admissions by Collier. The State also reminded the trial court that (1) there was no sequestration order in effect when the *Jackson v. Denno* hearing took place and (2) Kirkman was promptly removed from the courtroom when a sequestration order was issued.

truth.... [Kirkman] has no motivation to lie. [Kirkman] is a reliable witness." The defense did not object to these remarks. However, during closing argument by the defense, counsel asserted, "You tell me who has got motivation. Justin Kirkman has motivation, already convicted felon[,] already on probation." The State objected, and the jury exited the courtroom.

The State moved to reopen the case and play the recording of Kirkman's statements to the police, arguing it was entitled to this relief because defense counsel's closing remarks about Kirkman's motivation violated the defense's prior representation that it would neither argue recent fabrication on Kirkman's part nor suggest Kirkman gave false testimony to avoid incarceration. In response, defense counsel noted (1) he advised the trial court he would be attacking Kirkman's general credibility as a witness and (2) the State's closing argument included discussion of Kirkman's believability and reliability.

The trial court denied the State's motion to reopen the case. However, observing the defense did not make a timely objection to the remarks at issue in the State's closing argument, the trial court refused to allow the defense to argue Kirkman was "lying on the stand to save himself from going to jail because he's a convicted felon." The trial court emphasized its ruling was limited to allegations that Kirkman had an improper motive to testify untruthfully and specifically ruled the defense could attack Kirkman's credibility in other ways, including references to Kirkman's status as a convicted felon. Although the trial court prohibited the defense from suggesting Kirkman had an improper motive to give false testimony, it did not instruct the jury to ignore the remarks defense counsel had already made that Kirkman, as a convicted felon, had motivation to lie.

When defense counsel resumed his closing argument, he included several points that called Kirkman's credibility into question, including (1) Kirkman's prior record, (2) Kirkman's inability to make a positive identification of Collier until his in-court identification at trial, and (3) the possibility that Kirkman misidentified the person whom he saw attempting to remove a television from the Jamaican.

The jury found Collier guilty on the charge of second-degree burglary but acquitted him on the weapons charge.

The trial court sentenced Collier to thirteen years' imprisonment with credit for time served. This appeal followed.

## ISSUES ON APPEAL

I. Did the trial court improperly limit Collier's closing argument by prohibiting him from responding to the State's alleged bolstering of its key witness?

II. Did the trial court err in allowing the jury to hear recordings of Collier's first and third police interviews?

III. Did the trial court err in allowing Kirkman's in-court identification of Collier?

## STANDARD OF REVIEW

 "The conduct of a criminal trial is left largely to the sound discretion of the trial judge, who will not be reversed in the absence of a prejudicial abuse of discretion." *State v. Bryant*, 372 S.C. 305, 312, 642 S.E.2d 582, 586 (2007). "An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law." *Id.* This broad discretion applies to rulings regarding closing arguments. *See State v. Patterson*, 324 S.C. 5, 17, 482 S.E.2d 760, 766 (1997) ("[A] trial judge is vested with broad discretion in dealing with the range of propriety of closing argument, and ordinarily his rulings on such matters will not be disturbed.... The appellant has the burden of showing that any alleged error in argument deprived him of a fair trial.").

 "In determining whether a confession was given 'voluntarily,' [the appellate court] must consider the totality of the circumstances surrounding the defendant's giving the confession." *State v. Pittman*, 373 S.C. 527, 566, 647 S.E.2d 144, 164 (2007). However, "[t]he trial court's factual conclusions as to the voluntariness of a statement will not be disturbed on appeal unless so manifestly erroneous as to show an abuse of discretion." *State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001).

 "[A trial] court's decision to allow the in-court identification of an accused will not be reversed absent an abuse of discretion or prejudicial legal error." *State v. Simmons*, 384 S.C. 145, 166, 682 S.E.2d 19, 30 (Ct. App. 2009).

## LAW/ANALYSIS

### I. Limitations on Collier's Closing Argument

■ Collier first argues the trial court improperly limited his closing argument when it prohibited him from responding to remarks in the State's closing argument that allegedly bolstered Kirkman's credibility. Collier maintains the trial court allowed the State to argue during its closing that Kirkman "ha[d] no motivation to lie" but unfairly deprived him of the right to dispute this assertion during his own closing argument. However, Collier's objection on appeal is not directed at the bolstering itself; rather, he contends the State's alleged bolstering of Kirkman's credibility and reference to his motivation not to lie opened the door and invited a response from the defense. We find no reversible error.

■ Under the "invited response" doctrine, also referred to as the "invited reply" doctrine, "[o]nce the defendant opens the door, the solicitor's invited response is appropriate so long as it does not unfairly prejudice the defendant." *Ellenburg v. State*, 367 S.C. 66, 69, 625 S.E.2d 224, 226 (2006); *see also Vaughn v. State*, 362 S.C. 163, 169-70, 607 S.E.2d 72, 75 (2004) ("Once a defendant opens the door, the relevant question in determining if a defendant's rights were violated is whether the solicitor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974))). "[T]he idea of an invited response is not to excuse improper comments, but to determine their effect on the trial as a whole." *Id.* at 169, 607 S.E.2d at 75.

The doctrine has generally been applied upon a finding "that although a solicitor's closing argument was inappropriate, it was responsive to statements or arguments made by the defense, and thus did not deny the defendant due process." *Tappeiner v. State*, 416 S.C. 239, 251, 785 S.E.2d 471, 477 (2016). Nevertheless, we have found no binding authority prohibiting the use of the doctrine to justify an allegedly improper closing remark by a criminal defendant.

■ In the present case, however, the remarks in the State's closing argument that prompted the defense to assert

Kirkman had an improper motive to fabricate his testimony did not constitute bolstering. To the contrary, the State's closing remarks were confined to the record and did not evidence any personal vouching of Kirkman's credibility. *See State v. Shuler*, 344 S.C. 604, 630, 545 S.E.2d 805, 818 (2001) ("Improper vouching occurs when the prosecution places the government's prestige behind a witness by making explicit personal assurances of a witness' veracity, or where a prosecutor implicitly vouches for a witness' veracity by indicating information not presented to the jury supports the testimony.").

We further hold Collier had the burden to make a contemporaneous objection to any improper remarks in the State's closing argument instead of reneging on his earlier promise not to argue Kirkman fabricated his story to avoid a probation violation. *See U.S. v. Young*, 470 U.S. 1, 13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (advocating restraint in invoking the invited response doctrine and stating "the prosecutor at the close of defense summation should have objected to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury").

Furthermore, to the extent the remarks at issue invited a response from the defense, we hold the trial court gave the defense adequate leeway to attack Kirkman's credibility in its closing argument. The court did not prohibit the defense from questioning Kirkman's observation of the suspect or from pointing out inconsistencies between Kirkman's testimony and police accounts of the incident in its summation. Moreover, although the defense was not permitted to assert that Kirkman testified falsely to avoid criminal penalties, the trial court expressly allowed the defense to address Kirkman's status as a convicted felon and the implication of his criminal record on his general credibility as a witness. In view of these considerations, we hold the restrictions imposed by the trial court on Collier's closing argument were not an abuse of discretion.

Finally, we note that before the trial court ruled on the State's motion to reopen, defense counsel had already argued to the jury that Kirkman, as a convicted felon on probation, had motivation to lie about what had happened. The trial court did not instruct the jury to disregard this remark

or order it stricken from the record. Furthermore, after the trial court prohibited the defense from discussing improper motive in its closing argument, the defense never proffered additional remarks that it would have made but for this ruling. Given these circumstances, we hold Collier has not provided sufficient evidence to prove he was prejudiced by the trial court's ruling. *See State v. Tucker*, 324 S.C. 155, 169, 478 S.E.2d 260, 268 (1996) ("The burden of proof is on Appellant to show prejudice."); *State v. Reeves*, 301 S.C. 191, 194, 391 S.E.2d 241, 243 (1990) ("Error is harmless when it could not reasonably have affected the results of the trial."); *State v. White*, 371 S.C. 439, 447, 639 S.E.2d 160, 164 (Ct. App. 2006) ("[O]ur appellate courts have consistently held that trial court should only be reversed when an error is prejudicial and not harmless.").

## II. Admission of Collier's First and Third Interviews

■ Collier argues the jury should not have heard the recording of his first police interview because the interview took place shortly after he smoked crack cocaine. Collier points out that Truex, who conducted this interview, acknowledged during his testimony that crack cocaine can impair a user's decisions. Collier contends the highly addictive and intoxicating effects of the drug were likely to have induced him to do almost anything to avoid incarceration even if the primary effects of the drug had worn off. In opposing the admission of his third police interview, Collier argues (1) he requested this interview because of concerns about admissions he made during the first interview and (2) law enforcement made promises of leniency during this interview that overbore his will. The trial court rejected Collier's arguments that his statements during these interviews were not made voluntarily. We find no abuse of discretion.

Truex testified Collier did not appear to be under the influence of any drugs and refused his offer to postpone the first interview. In the audio recording of this interview submitted as an exhibit in this appeal, Collier appears relaxed and forthcoming with details, and we detected no signs of over-reaching on the part of law enforcement in eliciting information from Collier. Therefore, we affirm the trial court's deci-

sion to allow the jury to hear the recording of the first interview.

Collier also asserts the tape of his third interview should have been suppressed because "had Appellant not [made] his first statement under the influence of drugs, he would not have given a subsequent statement." [7] In essence, Collier argues because his first statement was involuntary due to his intoxication, his third statement must also be involuntary. Because we find his first interview was voluntary, we find the trial court did not abuse its discretion in finding the statements in the third interview were also voluntary.

We also reject Collier's argument that his cooperation with law enforcement and admissions during the third interview were a desperate attempt to appease the police in order to avoid incarceration; to the contrary, the detectives who interviewed him only assured him that telling the truth would not hurt his situation. *See State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 246-47 (1990) ("A statement induced by a promise of leniency is involuntary only if so connected with the inducement as to be a consequence of the promise.").

### III. In-Court Identification

██ Finally, Collier argues the trial court should not have allowed Kirkman to identify him before the jury because the pretrial identification procedure was unduly suggestive. Collier points out (1) he was the only person in the photo lineup who, like the suspect, wore a hooded sweatshirt; (2) Kirkman had only limited time to view the suspect; (3) Kirkman was able to eliminate only four of the six individuals depicted in the lineup, made no firm identification, and admitted he could not be one hundred percent sure the photograph he selected was indeed the person he encountered at the Jamaican; and (4) Kirkman himself expressed concern that he may have been unduly influenced by the fact that Collier was the only subject in the photo lineup who was wearing a hooded sweatshirt. Collier further contends (1) there were no indicators that Kirkman's out-of-court identification was so reliable that there could be no substantial likelihood of misidentification and (2)

---

7. Collier does not assert any other basis for finding the third interview was involuntary.

the problems resulting from the pretrial identification procedure were exacerbated by Kirkman's presence in the courtroom during the *Jackson v. Denno* hearing. We affirm the admission of the in-court identification.

"A criminal defendant may be deprived of due process of law by an identification procedure which is unnecessarily suggestive and conducive to irreparable mistaken identification." *State v. Traylor*, 360 S.C. 74, 81, 600 S.E.2d 523, 526 (2004). "An in-court identification of an accused is inadmissible if a suggestive out-of-court identification procedure created a very substantial likelihood of irreparable misidentification." *Id.* However, "[a]n identification may be reliable under the totality of circumstances even when a suggestive procedure has been used." *State v. Simmons*, 384 S.C. 145, 166, 682 S.E.2d 19, 30 (Ct. App. 2009). In determining whether an identification is reliable, the court must consider the following factors: (1) the witness's opportunity to view the suspect at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of any prior descriptions by the witness of the suspect, (4) the witness's level of certainty at the confrontation, and (5) the amount of time between the crime and confrontation. *Id.* at 166-67, 682 S.E.2d at 30.

To support his position that the photo lineup was unduly suggestive, Collier argues he was the only person depicted in the lineup who, like the person Kirkman confronted, wore a hooded sweatshirt. Collier points out Kirkman himself was reluctant to make a positive identification and even admitted he worried he "was associating ... since the gentleman in the photo had a hoodie on, that [he] was just associating those two together...." Although Kirkman's hesitation was probative of the reliability of his out-of-court identification, it does not necessarily follow that the lineup was tainted by suggestive police tactics. *Cf. State v. Turner*, 373 S.C. 121, 127-28, 644 S.E.2d 693, 697 (2007) (finding a photo lineup "not unduly suggestive ... [d]espite the variation in the background colors" because the defendant "d[id] not stand out in comparison with the other individuals in the lineup"); *State v. Stewart*, 275 S.C. 447, 449-51, 272 S.E.2d 628, 629-30 (1980) (rejecting all challenges by the appellant to the pretrial identification procedures used by the police even though, among other complaints,

the appellant was the only person placed in a physical lineup who had a beard).

Furthermore, regardless of any alleged flaws in the photo lineup, the trial court gave adequate consideration to the requisite factors in deciding to admit Kirkman's in-court identification of Collier. Although more than one year passed between the incident and Collier's trial, Kirkman testified he viewed the suspect face-to-face and in good lighting for ten to fifteen seconds. There was no evidence of any distractions that would have compromised Kirkman's degree of attention. Shortly after the incident, Kirkman assisted law enforcement in preparing a sketch that was provided to this court and resembles the picture from the photo lineup that he tentatively selected. Finally, Kirkman maintained since the time he met with the police that he "would a hundred percent recognize him in[ ]person." Moreover, during the *Neil v. Biggers* hearing, Kirkman testified he was sure Collier was the person he confronted at the Jamaican "[t]he second [he] saw [Collier's] face when [Kirkman] was in the courtroom" and his recognition of Collier was based on this prior encounter. This evidence is sufficient to support a finding that Kirkman's in-court identification was reliable even if the pretrial identification procedure was suggestive.

We further affirm the trial court's decision to admit Kirkman's in-court identification of Collier even though Kirkman was in the courtroom during the *Jackson v. Denno* hearing.

"Where identification is concerned, the general rule is that a trial court must hold an *in camera* hearing when the State offers a witness whose testimony identifies the defendant as the person who committed the crime, and the defendant challenges the in-court identification as being tainted by a previous, illegal identification or confrontation." *State v. Ramsey*, 345 S.C. 607, 613, 550 S.E.2d 294, 297 (2001). The purpose of the hearing is "to determine whether, under the circumstances of [the] case, [the witness's] identification of [the defendant is] so tainted as to require its suppression at trial." *State v. Simmons*, 308 S.C. 80, 83, 417 S.E.2d 92, 93-94 (1992). "In such [a] hearing, the testimony should be taken and all factual questions determined including those involving the [defendant's] constitutional rights pertinent to the admissi-

bility of the proffered evidence." *State v. Cash*, 257 S.C. 249, 253, 185 S.E.2d 525, 527 (1971).

Here, an in camera *Neil v. Biggers* hearing took place, during which the defense expressed concern about Kirkman's presence in the courtroom during the *Jackson v. Denno* hearing. However, defense counsel conceded he "d[idn't] know how much that played into [Kirkman's] identification all of a sudden a year later when it never happened before." Moreover, there was no evidence to support a finding that Kirkman's in-court identification of Collier resulted from anything Kirkman saw or heard during the *Jackson v. Denno* hearing. To the contrary, Kirkman testified at the *Neil v. Biggers* hearing "[t]he second" he saw Collier's face in the courtroom he was "one hundred percent" sure Collier was the person he observed attempting to remove a television from the Jamaican and his immediate recognition of Collier was based on his observation of Collier that night. Considering this testimony and the absence of any other indicia of undue influence, we hold Kirkman's in-court identification of Collier was not "so tainted as to require its suppression at trial." *Simmons*, 308 S.C. at 83, 417 S.E.2d at 94.

**AFFIRMED.**

HUFF and THOMAS, JJ., concur.