# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Randy Collins, Appellant.

Appellate Case No. 2018-002056

———————

Appeal From Georgetown County
Larry B. Hyman, Jr., Circuit Court Judge

———————

Opinion No. 5861
Heard May 4, 2021 – Filed September 8, 2021

———————

### REVERSED AND REMANDED

———————

E. Brandon Gaskins, of Moore & Van Allen, PLLC, of
Charleston, and Chief Appellate Defender Robert
Michael Dudek, of Columbia, both for Appellant.

Attorney General Alan McCrory Wilson, and Assistant
Attorney General Jonathan Scott Matthews, both of
Columbia; and Solicitor Jimmy A. Richardson, II, of
Conway, all for Respondent.

———————

**HUFF, J.:** Appellant, Randy Collins, appeals from his first-degree arson and
conspiracy convictions, asserting the trial court erred in (1) ruling his confession
was voluntarily given and (2) refusing to require further evaluation of him for
competency to stand trial. Because we find the trial court erred in finding his
confession was voluntarily given, we reverse and remand for a new trial.

# FACTUAL/PROCEDURAL HISTORY

This case involves the tragic death of a twelve-year-old boy (Child) as a result of an intentionally set fire. The State's theory of the case was that Child's mother, Marissa Cohen, obtained an insurance policy on the contents of a rented mobile home, she offered Appellant $5,000 to burn the mobile home, and Appellant enlisted the help of his nephew, James Miller (Miller), to carry out the plan. The vast majority of the crucial evidence admitted against Appellant was the challenged recorded statement he gave to law enforcement.

In the early morning hours of March 29, 2014, Andrews Fire Department and Georgetown County Fire EMS personnel responded to a mobile home fire in Andrews, South Carolina, after receiving a call around 1:15 a.m. Although they received information the home was vacant, once the fire was extinguished and the firefighters forced entry into the locked home, they discovered Child was dead inside the structure. The State produced evidence that Cohen obtained a $25,000 property insurance policy on the contents of the mobile home on February 20, 2014. On March 24, 2014, Cohen rented a storage unit and, shortly before the fire at the mobile home, she moved furniture and household appliances from the mobile home to the storage unit. One of the men who had earlier helped Cohen move her household items, Benjamin "Mano" Brown (Mano), testified that after he helped her move, Cohen told him she intended to burn the home. A couple of days before the fire Cohen moved with her children into the home of Frank Washington at Arbor Place Apartments. On the day of the fire, Cohen purchased $20 worth of kerosene from a convenience store in Andrews. On the night of the fire, Cohen's older son, Devon, and her younger child were at the Arbor Place apartment with Cohen but Child was not there, having gone to a birthday party at a recreation center around 8:30 p.m. on March 28, 2014. When Child and his friend left the party around 12:00 or 12:30 a.m., Child asked his friend if he could spend the night with him. Child said he was going to check on his mother and retrieve some clothes. The friend understood Child was going to the mobile home that they had moved out of earlier in the week. Child never returned.

Investigators quickly determined the fire had been intentionally set with the use of an accelerant poured on the floor of the home. Testing subsequently revealed the presence of heavy petroleum distillate—common in kerosene—in the home. SLED Agent Scott Hardee, an arson investigator, assisted Georgetown County Investigator Melvyn Garrett in the investigation of this case. Based on an anonymous tip, Agent Hardee discovered the insurance policy that had been taken out by Cohen, and Investigator Garrett discovered Cohen purchased kerosene the

day before the fire. This tip also indicated Appellant and Mano were involved. Investigator Garrett testified he spoke with Mano, who stated he was not there and did not know anything about the incident, which the investigator stated he was able to confirm. Investigator Garrett then spoke with Appellant on April 9, at which time Appellant told him he did not have anything to do with the fire and that he was at a club with his nephew, Miller, from 9:00 p.m. until 3:00 a.m. that night. The investigator also talked to Miller, who gave a statement likewise claiming he was with Appellant at a club from 9:00 p.m. until 3:00 a.m. on the night of the fire. Thereafter, Andrews Police Officer Oliver Nesmith served warrants on Appellant, obtaining his two cell phones. Agent Hardee noted phone records showed Cohen's and Appellant's phones had made contact with each other three times on March 28th, 2014—at 12:11 p.m., 3:27 p.m., and 9:07 p.m.—and three more times on March 29, 2014—at 2:50 a.m., 3:01 a.m., and 3:24 a.m.

On June 4, 2014, when Appellant arrived at Town Hall to retrieve his phones from Officer Nesmith,[1] Agent Hardee and Investigator Garrett used the opportunity to obtain an interview from Appellant. The officers read Appellant his rights and obtained a signed waiver of rights form from him at 10:20 a.m.[2] Agent Hardee then set up his personal camcorder to record the interview. Agent Hardee testified Appellant initially denied any involvement in the fire and denied he had any contact with Cohen, but when confronted, he changed his story and admitted contact with her. Agent Hardee testified Appellant ultimately told them that Cohen asked him to burn down her trailer and she would pay him $5,000; he went with Miller to the location; and he put all the blame on Miller as far as starting the fire but admitted he was there. The officers thereafter obtained arrest warrants for Appellant,[3] Cohen, and Miller.[4]

---

[1] Agent Hardee acknowledged they used Officer Nesmith, who Appellant had known for a long time, to get Appellant to come retrieve his phones with Agent Hardee and Investigator Garrett present. He agreed that, in essence, they tricked Appellant to get him to Town Hall.

[2] The officers proceeded to question Appellant until 1:51 p.m. Roughly an hour and a half into the interview, the battery died on the camcorder and, because the officers did not realize this, some of the interview was not recorded.

[3] Appellant's warrants were filed the next day, June 5, 2014.

[4] The record reveals, although Miller was arrested in this matter, he died on April 26, 2015—before Appellant's trial—apparently at the hands of Child's brother, Devon.

Like Agent Hardee, Investigator Garrett testified Appellant initially maintained that he was not involved with the fire but, as they confronted him with inconsistencies, he changed his story. According to Investigator Garrett, Appellant stated that Cohen offered him $5,000 to burn down the trailer, he told Miller about the offer, and he put himself at the crime scene when the fire started. Subject to Appellant's *Jackson v. Denno*[5] objection, the solicitor played Appellant's redacted interview for the jury.

Numerous individuals testified concerning Cohen's strange behavior and lack of concern regarding Child's death. Additionally, the State presented evidence concerning Cohen's nefarious intentions regarding Appellant and Mano after the fire. In particular, one of Cohen's cousin's testified Cohen told her she needed her to "help [her] get rid of Mano because [he was] the only one [who could] get [her] locked up." The State also presented evidence of a letter Cohen sent to her son, Devon, dated November 11, 2014. In the letter, Cohen wrote, "I heard [Appellant] has a bond. I wish that I had some backup and [Appellant] did have a bond just to deal with him. . . . I need a gun and meet up with [Appellant] and Mano."

The jury found Appellant guilty of arson in the first degree and criminal conspiracy. The trial court sentenced Appellant to thirty years' imprisonment on the arson charge and gave him a concurrent five-year sentence on the conspiracy charge.

## ISSUES

1. Did the trial court err in ruling Appellant's confession was voluntarily given?

2. Did the trial court err in refusing to require further evaluation of Appellant for his competency to stand trial based on indications that he suffered from intellectual disabilities?

## LAW/ANALYSIS

### I.     Voluntariness of Statement

### A. *Jackson v. Denno* Hearing and the Recorded Statement

---

[5] 378 U.S. 368 (1964).

Prior to the trial, the court conducted a hearing on the voluntariness of Appellant's statements to law enforcement. Investigator Garrett, Agent Hardee, and Appellant testified during this hearing, and the recording of the Appellant's interview was played at this time.

In regard to Appellant's recorded statement, Investigator Garrett testified that after the officers executed a search warrant on Appellant's phones, they utilized Andrews Police Officer Nesmith—who Appellant was familiar with and possibly related to—to facilitate this matter by having Officer Nesmith return Appellant's phones in his and Agent Hardee's presence at Town Hall. When Appellant arrived, Investigator Garrett and Agent Hardee asked him to speak with them about the incident. Appellant agreed and they went into a conference room at Town Hall. Agent Hardee went over Appellant's *Miranda*[6] rights, having Appellant initial beside each right, and Appellant signed the waiver of rights form at 10:20 a.m. on June 4, 2014. The conference room was not set up for recording purposes, but Agent Hardee had a video camera he was able to set up in the room. Investigator Garrett testified they were there approximately three hours, and during that time Appellant had a soda with him and was allowed to use the bathroom and smoke cigarettes a few times. He stated that at no time did they put any handcuffs or restraints on Appellant, at no time was he told he could not leave, they did not make any threats to get Appellant to talk, they took adequate breaks when Appellant requested them, and he had a phone with him that he could use if he desired. When asked if there were any promises made to Appellant to get him to talk, Investigator Garrett acknowledged that he told Appellant "that no matter what he told [him] . . . he was going to go home that particular day." Asked if they gave any hopes of assistance in the prosecution of the case, the officer replied, "Well, certainly, if he gave any information that led to the case being solved, then we would certainly ask for leniency of any type if we could," but there were no promises of leniency made. The State thereafter played the recorded interview. Concerning the part of the interview that was not recorded, Investigator Garrett stated that was not done with any purposeful intent, and no threats, coercions or promises were made during that time. He also stated he "kept [his] end of [the] bargain" concerning his discussion in the interview about talking with the solicitor. At the end of the interview, Investigator Garrett wrote a statement for Appellant, which Appellant signed.

Agent Hardee testified Appellant appeared to understand his rights and he was not handcuffed and was free to leave. He used his personal battery-powered camera to

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

record the interview, which was visible, on the table, to Appellant. Appellant never asked to stop the interview, he never asked to leave, he never asked for food, and he was provided with a soft drink as well as cigarette and bathroom breaks. The agent denied threatening or coercing Appellant into giving his statement. On cross-examination, Agent Hardee estimated the tape recording was turned off for 10-15 minutes during the interview. He agreed there was a time that Appellant asked to smoke a cigarette and he was told no, explaining it was at a very important part of the interview when Appellant was about to make an admission. Agent Hardee also acknowledged he told Appellant at some point that the tape recording of his interview "wasn't going any further" than that room, but the agent knew that was not true.

Appellant testified he did not know or understand about *Miranda* rights and he did not recall the officers reading him his rights. He stated his reading ability was "not too good," he only completed seventh or eighth grade, he never obtained a GED, and he was in special education classes. Appellant claimed he did not remember signing the *Miranda* waiver, explaining that he had difficulty remembering things since he suffered a stroke. He did not understand at the time he was with the officers that he had a right to a lawyer, that he did not have to talk to them, or that what he was saying could be used against him in a trial. Appellant testified he felt that he had to stay there and did not feel that he had the freedom to leave. He stated he thought he was just going to pick up his phone and did not think about giving an interview. Upon questioning by the trial court, Appellant stated the officers did not really threaten him, but they did promise they would talk to the solicitor if he was forthcoming.

A review of the recorded statement reveals Appellant initially denied having any knowledge in the matter. However, Appellant eventually told the officers that Cohen asked him to burn down the mobile home in exchange for $5,000 but he told her no; he told Miller what Cohen had said, and Miller indicated he would do it for $1,500; he and Miller went to the club the night of the fire; when they left, Appellant told Miller to take him home but Miller drove to a backroad behind the mobile home; Miller checked the doors to the home, but they were locked; Appellant told Miller not to do it; Miller threw a lit piece of paper or a match through a window of the home; and when they left, Miller circled around the area, but they did not see anything lit or any smoke, so Appellant did not believe Miller had successfully started a fire. Appellant gave inconsistent statements regarding what Miller used to light the fire and whether Appellant actually observed him throw a lit item into a window or whether Appellant was back at the car at that time so he could not actually see what Miller did.

We observe from the recording that Appellant informed the officers he suffered a stroke in the previous year, he did not feel well that morning, and he repeatedly indicated he had trouble with his memory. Of particular note, however, is an assurance made by Agent Hardee approximately twenty-one minutes into the interview, after Appellant was asked whether he thought the fire was intentionally started, and Appellant responded he did not want to "say the wrong thing." Agent Hardee responded, "Well, you're not going to say the wrong thing. *Whatever you tell me, it ain't gonna leave this room. This, um, tape is going into my file.* And I'm gonna, I'm gonna burn a copy for him. And we'll have a copy of this tape. *And it ain't gonna go any further than this room.* That's why we got the door shut, the blinds pulled, there's no sound device in here. I want you to be honest with me and tell me what you think."

In ruling on the matter, the trial court found "the seminal issue" as to the recorded statement was whether Appellant was *Mirandized*, and the court determined Appellant made a "knowing, voluntary and intelligent waiver of those rights." Remarking that the State must show by a preponderance of the evidence that Appellant waived his rights after being advised under *Miranda*, it found "that showing has certainly been made." The trial court noted that voluntariness hinged on whether there was police coercion. In contemplating the voluntariness of his statement, the trial court considered the characteristics of Appellant and found he had "the requisite intelligence to knowingly and intelligently waive his right to remain silent as well as his right to an attorney at the time the statements were made." It found "absolutely no evidence of coercion or threats made to [Appellant] at any time during the investigative interrogation." It further found the testimony of the two officers more credible than Appellant regarding his understanding of his rights and found the recorded statement was admissible.

### B. Discussion

Appellant argues the trial court erred in admitting his recorded statement as it was induced by deception regarding its use, promises of leniency, threats of severe punishment, and other factors which indicate his statement was not voluntary. In particular, he contends he was coerced and tricked into making inculpatory statements by the officers' misrepresentation that his statement would not be used against him. He maintains their promises that his statement would not leave the room and the recording would be placed only in their file conveyed it would not be used against him and rendered the previous *Miranda* warnings meaningless. Although it does not appear South Carolina has addressed the voluntariness of a

statement after police have assured confidentiality, Appellant notes other jurisdictions have ruled such assurances preclude a finding of voluntariness. Additionally, Appellant argues his statement was induced by implied promises of leniency and threats that he would die in prison if he did not cooperate. He also asserts his low level of education, recent stroke and cognitive impairments, along with the officers' coercive tactics, demonstrate his confession was not voluntary. Appellant contends, under the totality of the circumstances, his will was overborne and his statement was not voluntarily given. We agree.

"A confession is not admissible unless it was voluntarily made." *State v. Myers*, 359 S.C. 40, 47, 596 S.E.2d 488, 492 (2004). "If a defendant was advised of his *Miranda* rights, but chose to make a statement anyway, the 'burden is on the State to prove *by a preponderance of the evidence* that his rights were voluntarily waived.'" *State v. Childs*, 299 S.C. 471, 475, 385 S.E.2d 839, 842 (1989) (quoting *State v. Washington*, 296 S.C. 54, 55, 370 S.E.2d 611, 612 (1988)). "The State bears this burden of proof even [when] a defendant has signed a waiver of rights form." *Id.* "On appeal, the trial [court's] ruling as to the voluntariness of the confession will not be disturbed unless so erroneous as to constitute an abuse of discretion." *Myers*, 359 S.C. at 47, 596 S.E.2d at 492. "In determining whether a confession was given 'voluntarily,' [the appellate court] must consider the totality of the circumstances surrounding the defendant's giving the confession." *State v. Collier*, 421 S.C. 426, 435, 807 S.E.2d 206, 211 (Ct. App. 2017) (alteration in original) (quoting *State v. Pittman*, 373 S.C. 527, 566, 647 S.E.2d 144, 164 (2007)).

"The history of the Fifth Amendment right against compulsory self-incrimination, and the evils against which it was directed, have received considerable attention in the opinions" of the United States Supreme Court (USSC). *Michigan v. Tucker*, 417 U.S. 433, 439 (1974). These "decisions have referred to the right as 'the mainstay of our adversary system of criminal justice,' and as 'one of the great landmarks in man's struggle to make himself civilized.'" *Id.* (citations omitted) (first quoting *Johnson v. New Jersey*, 384 U.S. 719 (1966); then quoting *Ulmann v. United States*, 350 U.S. 422, 426 (1956)). "Prior to *Miranda*, [the courts] evaluated the admissibility of a suspect's confession under a voluntariness test." *Dickerson v. United States*, 530 U.S. 428, 432-33 (2000). "Over time, [the courts] recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." *Id.* at 433. The courts have not "abandoned this due process jurisprudence, and . . . continue to exclude confessions that were obtained involuntarily." *Id.* at 434. The

issue of voluntariness "is not limited to instances in which the claim is that the police conduct was 'inherently coercive.'" *Miller v. Fenton*, 474 U.S. 104, 110 (1985) (quoting *Ashcraft v. Tennessee*, 322 U.S. 143, 154 (1944)). Rather, it "applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will." *Id.*

"A criminal defendant is deprived of due process if his conviction is founded, in whole or in part, upon an involuntary confession." *Pittman*, 373 S.C. at 565, 647 S.E.2d at 164. "This principle is best justified when viewed as part and parcel of 'fundamental notions of fairness and justice in the determination of guilt or innocence which lie embedded in the feelings of the American people and are enshrined in the Due Process Clause of the Fourteenth Amendment.'" *Id.* (quoting *Haley v. Ohio*, 332 U.S. 596, 607 (1948)). "In determining whether a confession was given 'voluntarily,' [the appellate court] must consider the totality of the circumstances surrounding the defendant's giving the confession." *Id.* at 566, 647 S.E.2d at 164. "The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *State v. Miller*, 375 S.C. 370, 384, 652 S.E.2d 444, 451 (Ct. App. 2007) (quoting *Dickerson*, 530 U.S. at 434).

> [C]onvictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.

*Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961). Improperly extorted confessions "may be and have been, to an unascertained extent, found to be untrustworthy." *Id.* at 541. "But the constitutional principle of excluding confessions that are not voluntary does not rest on this consideration." *Id.* Though independent corroborating evidence may verify the truth of a defendant's confession, if a defendant has "been subjected to pressures to which, under our accusatorial system, an accused should not be subjected, [the courts are] constrained to find that the procedures leading to his conviction [have] failed to afford" the defendant due process of law. *Id.* In determining the voluntariness of a

statement, the question is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Id.* at 544. "As important as it is that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). Therefore, when faced with involuntary confessions, our courts "enforce[] the strongly felt attitude of our society that important human values are sacrificed [when] an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." *Id.* at 206-07.

> [T]he [USSC] has instructed [that] the totality of the circumstances includes "the youth of the accused, his lack of education or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep."

*Pittman*, 373 S.C. at 566, 647 S.E.2d at 164 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Our appellate courts have also "recognized that appropriate factors to consider in the totality-of-circumstances analysis include: background, experience, and conduct of the accused; age; length of custody; police misrepresentations; isolation of a minor from his or her parent; threats of violence; and promises of leniency." *Miller*, 375 S.C. at 386, 652 S.E.2d at 452. "[N]o one factor is determinative, but each case requires careful scrutiny of all the surrounding circumstances." *Pittman*, 373 S.C. at 566, 647 S.E.2d at 164. "The pertinent inquiry is, as always, whether the defendant's will was 'overborne.'" *Myers*, 359 at 47, 596 S.E.2d at 492 (quoting *State v. Von Dohlen*, 322 S.C. 234, 244, 471 S.E.2d 689, 695 (1996)). "Coercive police activity is a necessary predicate to finding a statement is not voluntary." *Miller*, 375 S.C. at 386, 652 S.E.2d at 452. "Coercion is determined from the perspective of the suspect." *Id.*

"A statement may not be 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] obtained by the exertion of improper influence.'" *Id.* (alterations in original) (quoting *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 246 (1990)). "A statement induced by a promise of

leniency is involuntary only if so connected with the inducement as to be a consequence of the promise." *Rochester*, 301 S.C. at 200, 391 S.E.2d at 246-47. "The test of voluntariness is whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *State v. Goodwin*, 384 S.C. 588, 601, 683 S.E.2d 500, 507 (Ct. App. 2009). "If a suspect's will is overborne and his capacity for self-determination critically impaired, use of the resulting confession offends due process." *State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001).

Both parties agree that the voluntariness of a statement, following law enforcement assurance of the statement's confidentiality, has not been addressed in South Carolina. However, as noted by Appellant, this issue has arisen in other jurisdictions.

In *Redmond v. People*, 501 P.2d 1051 (Colo. 1972), the Colorado Supreme Court reversed the admission of the defendant's confession, finding the *Miranda* warning given to the defendant was meaningless after the defendant was told parts of his statement would not be used and that the focus of attention was not upon him but upon another.[7] *Id.* at 1052-53. In that case, the evidence showed Douglas Redmond and an individual named Wolford devised a scheme to acquire hashish in San Francisco for eventual sale in Colorado. *Id.* at 1051. Marc Tobias, a part-time police informant, became included in the plan and subsequently alerted the police about airline reservations made for transportation of the drug as well as the location of the drug once they arrived in Colorado. *Id.* at 1051-52. Redmond was given a full *Miranda* warning, signed an advisement form including the same, and was then interrogated. *Id.* at 1052. Before Redmond made any incriminating statements, an officer told him the police were interested in the involvement of Tobias and told him the information he provided, apart from that which involved Tobias, "would just be between the two of them and would be off-the-record and would not be used against him, even if it were incriminating." *Id.* The officer proceeded to take notes during the interview regarding the defendant's statements related to Tobias but stopped taking notes when Redmond discussed matters unrelated to Tobias. *Id.* "Redmond . . . was never told that the barrier of immunity from prosecution, [created by the officer], had disappeared." *Id.* The trial court

_____

[7] Notably, as is the law of this state, Colorado law provides the appellate court is required to accept the trial court's findings and ruling on admissibility of a statement if there is sufficient evidence to support the same. *Id.* at 1052.

admitted the portions of the statement included in the officer's notes, i.e., those that related to Tobias. *Id.* On appeal, the sole issue before the appellate court was "whether the admission of the defendant's statement to [the officer], in . . . light of the non-disclosure agreement which [the officer] made, foreclose[d] the admission of the statement made by Redmond." *Id.* The court determined the clear language of *Miranda* "prohibit[ed] the use of a blue-pencil test as a means of admitting part of Redmond's statement," and found, given the type of promise that prompted Redmond's confession, it was not possible to determine what parts of the statement were truly voluntary and what parts were, at best, inadmissible. *Id.* at 1052-53. Accordingly, the court reversed and remanded for a new trial. *Id.* at 1053.

In *Porter v. State*, 239 S.E.2d 694 (Ga. Ct. App. 1977), the Court of Appeals of Georgia found the defendant's confession was inadmissible on the face of the record before the appellate court.[8] *Id.* at 642. There, after Porter was read his *Miranda* rights, the Sheriff said, "We don't want to get on the street and say anything about what he said now?" *Id.* Another individual in the room responded, "No, that's right. That's what I've told him and the GBI [agent] explained to him this is just for his secretary in typing . . . [.]" *Id.* The court found "the clear thrust of the conversation [was] that Porter was being told his statement would not be used against him" and it was being recorded for the purpose of the agent's notes being typed by his secretary. *Id.* The court then held, "A confession given under such a pretense may not be admitted against the confessor." *Id.*

In *United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014), the United States Court of Appeals for the Ninth Circuit determined that under the totality of circumstances—which included Preston's intellectual disability as well as a promise by officers during questioning that they would not "tell this to anybody,"—Preston's confession was involuntarily given and should not have been admitted at trial. *Id.* at 1010, 1014. The court observed Preston had an IQ of sixty-five—which was in the range of intellectual disability as recognized by the USSC.

---

[8] Though not addressed in *Porter*, Georgia courts also appear to apply an abuse of discretion standard in reviewing the admissibility of statements. *See Berry v. State,* 326 S.E.2d 748, 751 (Ga. 1985) ("Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal."); *Golden v. State*, 852 S.E.2d 524, 530 (Ga. 2020) (noting the appellate court defers to the trial court's findings of disputed facts and will not disturb the trial court's factual and credibility determinations unless they are clearly erroneous, but applies de novo review of the trial court's application of the law to the facts).

*Id.* at 1010. The court also looked at other factors occurring during the questioning—including some with similarities to the case at hand—such as the fact that: the officers minimized culpability of one type of perpetrator and the consequences of such to those individuals if they were truthful; they told Preston he was not arrested or in custody but also informed him he was "free to go" after the interview while indicating he was free to stop talking to them only when they terminated the interview and conveying that he had to tell them something or they would keep coming back to him until he did; they asked Preston questions that required him to choose between two incriminating alternatives; they asked a number of leading questions that introduced facts Preston did not mention until brought up by the officers; they mislead Preston about the purpose of the statement, promising they would not tell anybody and that his statement would never leave the U.S. Attorney's file; and the summary of Preston's confession was a brief gathering of details chosen by the officers and handwritten by one of the officers, but which Preston never corrected when repeated back to him. *Id.* at 1013-15. The court concluded, "in light of the totality of the circumstances, including Preston's individual characteristics, his confession was involuntary." *Id.* at 1020. In doing so, the court noted Preston's reduced mental capacity, his susceptibility to interrogative pressure based upon such, and the techniques used by the officers during their interrogation of Preston. *Id.* 1020-26. The court cautioned that "when questioning people of low intelligence, investigators should avoid offering promises of leniency or using deceptive interrogation techniques due to the vulnerability of [such a] group." *Id.* at 1026. It then stated as follows:

> The officers misled Preston in other ways as well, telling him that his written confession was just an apology note to the child, that they would not tell anyone else what he said, and that the confession would never leave the "folder" or the United States Attorney's Office. At the same time, they told Preston that he was free to leave only *after* he finished answering their questions, and threatened that they would keep returning until Preston did so. In this way, the police paired the prospect of relentless questioning with false promises of leniency. Such tactics, in combination, would be hard for a person of Preston's impaired intelligence to withstand or rationally evaluate.

> Assuredly, interrogating officers can make *false representations* concerning the crime or the investigation during questioning without always rendering an ensuing confession coerced. But *false promises* stand on a different footing.

*Id.* (second and third emphases added) (footnotes omitted) (citation omitted).

Other states have also determined that trial courts should have suppressed defendants' statements that were induced by misleading tactics of law enforcement. In *Ex parte Johnson*, the trial court conducted a hearing to determine the voluntariness of the defendant's statement, during which the defendant testified that he consented to answer the trooper's questions only upon the trooper's assurance that his responses were for use in the completion of a traffic accident report in an incident in Tennessee and that those responses would not be used against him in any criminal proceeding in Tennessee or Alabama. 522 So. 2d 234, 236 (Ala. 1988). The trooper testified that he did not recall telling Johnson that the statement and accident report would not be used against him in subsequent proceedings in Alabama. *Id.* The testimony being in dispute, the trial court made a credibility determination regarding the disputed testimony in favor of the trooper. *Id.* The Alabama Supreme Court noted,

> [B]ecause the determination of voluntariness of a confession is within the sound discretion of the trial judge, it has been generally held that "his decision will not be disturbed unless it is palpably contrary to the great weight of the evidence. He need only be convinced by a preponderance of the evidence that it was voluntarily made."

*Id.* (quoting *Hammins v. State*, 439 So.2d 809, 811 (Ala. Crim. App. 1983)). Nonetheless, it found, under the totality of the circumstances—the standard by which the court was bound—the defendant's statement to the trooper was the product of deception. *Id.* at 237. The court observed that the trooper's own testimony showed the defendant "was told the interview was 'strictly' for the purpose of investigation of a traffic accident." *Id.* It further noted the trooper could not affirmatively and unequivocally testify that he did not tell the defendant that the accident report would not be used in Alabama as asserted by the defendant. *Id.* Also, in spite of the fact that there was another witness present during the entire interview, that person was not called to corroborate the trooper's testimony. *Id.* The court thus concluded the defendant's purported waiver of rights was not voluntarily, knowingly, and intelligently made and concluded his statement was inadmissible at trial. *Id.*; *see also State v. Stanga*, 617 N.W.2d 486, 487 (S.D. 2000) (holding the defendant's confession should have been suppressed when the interrogating officer repeatedly told the defendant that any statement he gave was "between you and me," signifying that it would not go beyond the interrogation

room, as law enforcement is not allowed to mislead suspects on their constitutional rights).

We note there is no dispute as to what occurred and what was said during the interview at hand, as we have the video of it before us. Upon a thorough review of the recording, as well as the *Jackson v. Denno* hearing, we find, under the totality of the circumstances, the trial court erred in admitting Appellant's recorded statement. *See Collier*, 421 S.C. at 435, 807 S.E.2d at 211 ("In determining whether a confession was given 'voluntarily,' [the appellate court] must consider the totality of the circumstances surrounding the defendant's giving the confession." (alteration in original) (quoting *Pittman*, 373 S.C. at 566, 647 S.E.2d at 164)). First, like the Georgia, Colorado and Alabama courts, we believe that if a defendant receives *Miranda* warnings and it is thereafter conveyed to him during the interview that his statement, whether in whole or in part, would not be used against him and/or is being obtained for some other purpose, such may render the statement inadmissible.[9] As previously noted, Agent Hardee assured Appellant—before any inculpatory statement made by Appellant—"Whatever you tell me, it ain't gonna leave this room. This, um, tape is going into my file. . . . . And we'll have a copy of this tape. And it ain't gonna go any further than this room. That's why we got the door shut, the blinds pulled, there's no sound device in here." As in *Porter*, "the clear thrust" of this statement by Agent Hardee was that Appellant was being told his statement was not going to be told to others to be used against him but was recorded simply for their own files. As in *Redmond*, the officer indisputably conveyed to Appellant that his statement would not be used against him, and the focus of attention was not on Appellant but was on another—Cohen. Further, at no point during the interview did the officers here communicate that this promise to Appellant was no longer effective. We agree with Appellant that, though interrogating officers may sometimes make *false representations* concerning the facts surrounding the crime without rendering an ensuing confession coerced, they cannot make *false promises*, whether direct or implied, that induce a confession from the individual. *See Miller*, 375 S.C. at 386, 652 S.E.2d at 452 ("A statement may not be 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] obtained by the exertion of improper influence.'" (alterations in original) (quoting *Rochester*, 301 S.C. at 200, 391 S.E.2d at 246)); *Preston*, 751 F.3d at 1026 ("[I]nterrogating officers can make false representations concerning the crime or

---

[9] The State conceded in oral argument that if *Miranda* warnings were required here, Agent Hardee's assurance negated the warnings, rendering Appellant's statements inadmissible as a matter of law.

the investigation during questioning without always rendering an ensuing confession coerced[, b]ut false promises stand on a different footing." (citation omitted)).

Further, even if Agent Hardee's assurance of the confidentiality of Appellant's statement, on its own, is not sufficient to render Appellant's statement involuntary, we find various other factors unquestionably pushed his statement over the line into one in which Appellant's will was overborne. The officers repeatedly informed Appellant that they would speak to the solicitor on his behalf. We acknowledge that the officers' assurances that they would speak on Appellant's behalf are not, alone, sufficient to constitute promises of leniency that induced Appellant's statement. *See State v. Arrowood*, 375 S.C. 359, 368-69, 652 S.E.2d 438, 443 (Ct. App. 2007) (holding an offer by police officers to attest to a defendant's cooperation with an investigation was not a promise of leniency, and his statements were not produced as a consequence of any promise); *Rochester*, 301 S.C. at 200, 391 S.E.2d at 246-47 ("A statement induced by a promise of leniency is involuntary only if so connected with the inducement as to be a consequence of the promise."). Nevertheless, the officers conveyed this to Appellant in conjunction with various coercive tactics. In particular, the officers pushed for the information they sought while simultaneously indicating to Appellant the following: they sought the information for the purpose of prosecuting Cohen; they did not care who started the fire; they were there to help Appellant; and no matter what he told them, Appellant was going to get to go home after the interview. They also made a promise to speak up for Appellant while threatening Appellant that if he did not give them the information they sought, they would go after Appellant and "put [him] there" with Cohen. They informed Appellant that, while they wanted Cohen to serve thirty-four years for the crime, if it was not her, it would be someone else—implicitly Appellant—and suggested at his current age and health condition, Appellant was "not built" for such a prison sentence and would not survive it. We acknowledge the evidence presented here does not disclose Appellant's IQ or that he suffered an intellectual impairment to the same degree as that of the defendant in *Preston*. Nonetheless, there is evidence that Appellant suffered from a mental deficiency as evidenced by (1) his low level of education and the fact that while in school he was enrolled in special education classes and (2) his physical health issues that may have additionally impaired his cognitive abilities. We find Appellant's statement to be the product of: promises that no matter what he told them, he would be allowed to go home; consistent assurances that Appellant was not the person they sought to hold culpable of the crime; suggestions that if they did not get information from him implicating Cohen, they would come after him; threats that Appellant could go

to jail for thirty-four years and, given his age and poor health, he likely would never come home from incarceration; promises to "speak up" for Appellant and "talk" for him if he gave them the information they wanted; and, most importantly, assurances that whatever Appellant told them would not leave that room. Further, we note, while Appellant may not suffer from an "intellectual disability"—as defined in our statutes—it is undisputed that Appellant does suffer from an intellectual deficit or impairment. Our review of the record demonstrates the officers' coercive and deceptive tactics during the interview caused Appellant's will to be overborne, inducing him to make the inculpatory statement. *See Saltz*, 346 S.C. at 136, 551 S.E.2d at 252 ("If a suspect's will is overborne and his capacity for self-determination critically impaired, use of the resulting confession offends due process.").

We are not insensitive to the deferential standard of review we apply to the trial court's determination of the voluntariness of a statement. *See Myers*, 359 S.C. at 47, 596 S.E.2d at 492. ("On appeal, the trial [court's] ruling as to the voluntariness of the confession will not be disturbed unless so erroneous as to constitute an abuse of discretion."). However, this court is still tasked with considering the totality of the circumstances surrounding the defendant's giving of a confession in determining whether a confession was given voluntarily. *See Collier*, 421 S.C. at 435, 807 S.E.2d at 211 ("In determining whether a confession was given 'voluntarily,' [the appellate court] must consider the totality of the circumstances surrounding the defendant's giving the confession." (alteration in original) (quoting *Pittman*, 373 S.C. at 566, 647 S.E.2d at 164)); *Ex parte Johnson*, 522 So. 2d at 236-37 (observing, while the determination of voluntariness of a confession is within the sound discretion of the trial judge and generally will not be disturbed unless contrary to the great weight of the evidence, the appellate court is bound by the totality of the circumstances). In considering the totality of all the surrounding circumstances—including the characteristics of the accused and the details of the interrogation—we find the trial court abused its discretion in finding Appellant's recorded statement was voluntarily made, and the trial court erred by admitting it into evidence. *See State v. Osborne*, 301 S.C. 363, 365, 367, 392 S.E.2d 178, 179, 180 (1990) (finding the State failed to meet its burden by a preponderance of the evidence and the trial court erred in admitting Osborne's statements into evidence when she was told on numerous occasions that she could remain silent, but if she knew any information, she could be charged with the crime of withholding evidence); *State v. Peake*, 291 S.C. 138, 139, 352 S.E.2d 487, 488 (1987) (holding the State failed to meet its burden of showing the appellant's statement was voluntary and not the product of the officer's promise of leniency when the officer's promise was tantamount to a promise not to seek the death penalty if the

appellant gave a statement). *Cf. State v. Compton*, 366 S.C. 671, 680, 623 S.E.2d 661, 666 (Ct. App. 2005) (finding the trial court properly concluded the appellant's statements were given knowingly and voluntarily, noting the record indicated the appellant "was never told his statements would not be used against him" and nothing indicated the appellant "made the statements involuntarily and based upon a promise of leniency"). Based upon the record before us, we come to the inescapable conclusion that Appellant's confession can fairly be characterized only as involuntary and, therefore, his convictions must be reversed and the matter remanded for a new trial.

## II.     Competency

Appellant also challenges the trial court's failure to require further evaluation of him by the Department of Disabilities and Special Needs after his examination by the Department of Mental Health. The record reveals that one of the concerns of the trial court was the timing of Appellant's argument that he required further evaluation. Because we are reversing and remanding for a new trial, and inasmuch as Appellant's mental competency may have changed over the course of time—thereby requiring a new evaluation and hearing—we decline to address the competency issue. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address remaining issues on appeal when its determination of a prior issue is dispositive); *State v. Mekler*, 379 S.C. 12, 17, 664 S.E.2d 477, 479 (2008) (affirming this court's decision reversing defendant's conviction and granting a new trial, but finding it unnecessary to address another issue, noting resolution of the issue upon retrial would be dependent on updated factors).

### CONCLUSION

For the foregoing reasons, we reverse Appellant's convictions and remand for a new trial.

**REVERSED AND REMANDED.**

**LOCKEMY, CJ., and HEWITT, JJ., concur.**