596 S.E.2d 488

**The STATE, Respondent,**

v.

**Wesley Max MYERS, Appellant.**

**No. 25818.**

Supreme Court of South Carolina.

Heard April 6, 2004.

Decided May 11, 2004.

Rehearing Denied June 9, 2004.

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General William Edgar Salter, III, all of Columbia, and Ralph E. Hoisington, of Charleston, for Respondent.

Justice PLEICONES:

Wesley Myers (Appellant) was convicted of murder and arson in the third degree. Appellant was sentenced to thirty years imprisonment for murder and ten years imprisonment for arson. Appellant appealed his convictions on multiple grounds. This appeal was certified from the Court of Appeals pursuant to Rule 204(b), SCACR. We affirm.

## FACTS

On Thursday, March 13, 1997, at 3:15 am the fire department responded to an emergency call and found the Mill Inn Tavern on fire. A body was discovered in the bar after the fire was extinguished. The body was that of Teresa Haught (Teresa), Appellant's girlfriend and manager of the bar. Teresa had been hit in the head, and then the bar had been set on fire. During the investigation of the scene, some hairs were found in Teresa's hand.

The police interviewed Appellant three different times: at the scene of the fire (early Thursday morning), and twice at the police station (Friday and Saturday). On Thursday and Friday, Appellant was cooperative and consistently offered to help the police find the killer. During a skillfully conducted

interrogation on Friday, the police sought, and obtained, Appellant's agreement that the hair found in Teresa's hand must have come from the head of the person who killed her.

At the meeting on Saturday with Appellant, the police told Appellant that South Carolina Law Enforcement Division (SLED) had matched the hair found in Teresa's hand to the hair that Appellant had given the police for testing.[1] At that point, Appellant confessed to killing Teresa. Appellant's confession stated:

On March 13th, 1997 at about 2:00am or so I drove to the Mill Inn to check on my girlfriend, Theresa (sic) Haught. I parked my truck beside her Mercury parked in front of the Mill Inn. I went to the front door and knocked. Teresa came to the door about 5–10 minutes later. It is not uncommon for me to go by and check on her at closing time. There was no one in there or I don't think there was anyone in there. While I was in the bar, I found a pink note on the bar. It was a note signed by Allen White. I think it said that "I'll see you later" and it was signed by him. I thought that they might have had something going. I had seen Allen pinch her and kiss her on the lips. I asked her about the note and she said that it was none of my business. Teresa pushed me by the chin and the chest hard. I told her "don't push me Teresa." She hit me in my chest with her fist. Then, she pushed me up against the bar. I told her not to hit on me. Teresa grabbed the glass wine craft (sic) and she told me to get away. I grabbed the wine craft (sic) from her. Then, she pushed me in the face. I struck her in the center of the head with the wine craft (sic). Both of us went down to the floor. Like a blur, I lost control. I went around the counter behind the bar. I believe I held her for a while on the floor before I went around the counter. I think I struck her twice. I was raged upset, real mad. I couldn't believe what she was saying. She called me a fool. I grabbed "closed on Sunday sign" and some papers. At that state I grabbed anything around. I piled some papers up behind the bar and lit it with a lighter. I remember I wanted to die. I wanted to burn up in there

---

1. The police actually received the call from SLED on Friday, before the interview with Appellant began.

with her. I sat there and closed my eyes and the fire was getting really big. I went out the back door and went to the right. I went around front and got into my truck. I put a purse behind the seat of my truck. I don't remember what I did with the purse. I drove home. I forgot to mention that I opened the cabinet behind the bar looking for something to burn.

The hair that was found in Teresa's hand was lost when SLED sent the hair to the FBI for DNA analysis, so there is no physical evidence linking Appellant to the crime.

## ISSUES

1. Did the trial court err in admitting Appellant's confession?

2. Did the trial court err in admitting into evidence an anger management questionnaire completed by Appellant, in which he acknowledged problems with controlling his emotions?

3. Did the trial judge err in sealing letters from the solicitor to the police department because the letters contained impeachment or exculpatory evidence?

4. Did the trial court err in ruling Dr. Saul Kassin, an expert in social psychology, could not use examples or facts from other states to illustrate his opinion about false confessions?

## ANALYSIS

1. Confession

Appellant argues that the confession should have been suppressed because it was the product of police trickery and coercion. The totality of the circumstances does not demonstrate that Appellant's will was overborne by the police. As there is no evidence that the confession was not voluntary we therefore hold that the trial court did not err in admitting Appellant's confession.

Initially, Appellant gave a statement to a police officer on Thursday, at the scene of the fire. Before giving the statement, Appellant was advised of his rights. Appellant did not say anything incriminating in this statement.

On Friday, Appellant met with Officer McHale at the police station. When Appellant arrived at the station, the officers were leaving for lunch and invited Appellant to join them. Appellant declined. After the officers returned, McHale read Appellant his Miranda rights, and Appellant waived his rights. During Friday's interview, McHale used the "Reid Technique" of interrogation.[2] The Reid technique involves nine steps. The first part of the process involves "breaking the suspect down" by asserting the suspect's guilt and not allowing the suspect to deny his or her guilt. The second part of the process involves "development of alternative questions" in which the interrogator gives the suspect a "face-saving or moral-justifying alternative." For example, the interrogator would say "maybe you were provoked" or "maybe it was an accident" or "I know this isn't something that you wanted to do or planned."

Initially, Appellant agreed to take a polygraph examination, but during the interview with McHale, Appellant told McHale that Appellant had been up all night, had 24 beers to drink the night before, and had taken caffeine pills. McHale decided to send Appellant home, and asked Appellant to get a good night's rest before meeting with the police on Saturday. McHale testified that he stopped the interrogation because he wanted to make sure that if the police elicited a confession, it would be admissible in court. Appellant did not make any incriminating statements on Friday.

On Saturday, Officer Clayton took Appellant to breakfast, then Clayton took Appellant to the station for the interrogation. Appellant was again advised of his rights. During this interrogation, the officers spoke with Appellant for about an hour and a half before Lt. Cumbee arrived and asked Appellant to come into his office. Appellant agreed with the police that "the hair that was found in [Teresa's] hand belonged to

---

**2.** During the Friday interview, McHale told Appellant, among other things, that McHale sometimes thought about killing his own wife, and that he had once pushed his wife when she was pregnant. McHale testified that the purpose behind these statements was for Appellant to relate to McHale and also for McHale to gauge the reaction of Appellant. Also, McHale suggested to Appellant that the police had evidence that Appellant was in the bar the night of Teresa's murder, even though the police did not have any such evidence.

the person who [murdered her]." After Appellant said this, Lt. Cumbee left the office and when he came back he "told the [Appellant] that [Lt. Cumbee] just received a phone call from SLED and that SLED said the hair that was found in [Teresa's] hand is from, came from [Appellant] ... that it matched." In reality, the police had received the phone call on Friday from SLED stating that the hair matched.[3] When Appellant was confronted with this information, he said "I must have did it then." Lt. Cumbee said "Well, don't you think you need to say you're sorry?" Appellant said "I'm sorry, Teresa. I didn't mean to do it. It was an accident." Then, Lt. Cumbee pulled out a photograph of Teresa, and Appellant started rubbing the photograph and saying that he was sorry. Appellant told the police the details of the murder. At this point, the police took Appellant to the park where he said he hid Teresa's purse, however, they were unable to locate the purse. They returned to the police station and Appellant signed the written statement. Appellant was placed under arrest.

After Appellant signed the written statement, Lt. Cumbee asked Appellant if he wanted to speak to Teresa's mother. He said yes, and Teresa's mother was brought into a conference room. There, Appellant told her he was sorry and that he lost control and that he had killed Teresa.

After the arrest, Lt. Cumbee called the media and informed them he had made an arrest, and that the police would be escorting Appellant to the county jail later in the afternoon. When Appellant was escorted out of the station, he told the reporters that he wanted to make a statement. Both Lt. Cumbee and Officer Tetanich testified that they advised Appellant not to talk to the media, but that Appellant told them that "I want to tell the world how sorry I am." Appellant told the reporters that he killed Teresa and that he was sorry for what he had done.

Appellant argues the initial confession was coerced, and therefore the statement to Teresa's mother and the

---

**3.** SLED had not conducted a DNA analysis on the hair, but had inspected the hair through a microscope. There was a microscopic match, meaning that the hair was consistent with Appellant's hair. However, this analysis does not yield a positive identification, like DNA.

statement to the media were inadmissible as fruit of the poisonous tree. We disagree. A confession is not admissible unless it was voluntarily made. *State v. Von Dohlen,* 322 S.C. 234, 471 S.E.2d 689 (1996) (quoting *State v. Childs,* 299 S.C. 471, 385 S.E.2d 839 (1989)). A determination whether a confession was "given voluntarily requires an examination of the totality of the circumstances." *Von Dohlen,* 471 S.E.2d at 694–95. On appeal, the trial judge's ruling as to the voluntariness of the confession will not be disturbed unless so erroneous as to constitute an abuse of discretion. *Id.* "Both this Court and the United States Supreme Court have recognized that misrepresentations of evidence by police, although a relevant factor, do not render an otherwise voluntary confession inadmissible ... The pertinent inquiry is, as always, whether the defendant's will was 'overborne.'" *Id.*

The trial judge did not abuse his discretion in allowing the confession into evidence. Appellant was advised of his rights three different times. Not one of the interrogations lasted more than a few hours. Appellant was offered food by the police and told he was free to leave the station at any time on Friday. Also, the police made sure that Appellant was well rested and fresh before they interrogated him on Saturday. In addition, when the police told Appellant that the hair found in Teresa's hand matched Appellant's hair, they were communicating the information that they received from SLED. Even if the information were untrue, it is not, alone, enough to render the confession involuntary. *See Von Dohlen,* 471 S.E.2d at 695; *State v. Rabon,* 275 S.C. 459, 272 S.E.2d 634 (1980)("A misrepresentation, while relevant, may be insufficient to render inadmissible an otherwise valid confession"); *State v. Register,* 323 S.C. 471, 476 S.E.2d 153 (1996)(holding defendant's confession was voluntary and admissible when police misrepresented to defendant that he had been seen with the victim the night she was murdered, that his tires and shoe matched impressions found at the murder scene, and that the police had DNA evidence establishing defendant's guilt). Since the initial confession was voluntary, the subsequent statements were properly admitted.

While we find no fruit of the poisonous tree here, we cannot let pass without comment the police conduct in arranging media coverage of Appellant's "perp walk." Such actions were

improper and reflect poorly on the professionalism of the department.

## 2. Anger Management Questionnaire

Appellant argues that the trial judge should have excluded an anger management questionnaire taken by Appellant because any probative value was substantially outweighed by its prejudicial effect under Rule 403, SCRE. We agree that the questionnaire should have been excluded, but affirm the trial court because its erroneous admission was harmless error.

The police found the questionnaire during a search of Appellant's house. The questionnaire was from an adult outpatient treatment program that Appellant attended for alcoholism. It is titled "Anger Questionnaire Worksheet." Appellant answered yes to both "I've gotten so angry at times, that I've become physically violent, hitting other people or breaking things" and "At times, I've felt angry enough to kill," among other questions. The State's theory of the case was that Appellant killed Teresa in a fit of rage. Appellant argued that it was unclear when Appellant filled out the questionnaire, and that it was too prejudicial to be admitted into evidence.

This Court reviews 403 rulings pursuant to the abuse of discretion standard, and gives great deference to the trial judge's decision. *State v. Aleksey,* 343 S.C. 20, 538 S.E.2d 248 (2000). We agree with Appellant that the prejudicial value of the questionnaire substantially outweighed the probative value and should have been excluded from evidence. It is unclear when, or under what circumstances, the questionnaire was filled out. However, this error was harmless in light of Appellant's confession. *State v. Reeves,* 301 S.C. 191, 391 S.E.2d 241 (1990).

## 3. Sealed letters

Appellant argues the trial court erred in sealing two letters as the letters contained impeachment or exculpatory evidence related to police misconduct. Judge Cottingham ruled in a pre-trial hearing that these letters were work product, and ordered the letters sealed. We have reviewed the

letters and determined that the trial court did not err in sealing the letters, as one of the letters is work product and the other is not relevant.

There are two letters at issue in this case. First is a copy of a letter to Chief Caldwell of the North Charleston Police Department from David Schwacke, Solicitor, Ninth Judicial Circuit, written on January 29, 1998 (hereinafter "January letter"). The second letter is from Amie Clifford, Assistant Solicitor, Ninth Judicial Circuit, to Chief Caldwell, sent on July 15, 1999 (hereinafter "July letter"). The July letter is specifically about the case at hand, and is written to Chief Caldwell regarding numerous issues with the case.

Rule 5(a)(2) SCRCrimP, exempts from discovery work product, or "internal prosecution documents made by the attorney for the prosecution or other prosecution agents in connection with the investigation or prosecution of the case. . . ." In essence, Rule 5 SCRCrimP exempts "internal prosecution documents made in connection with an investigation." *State v. Hughes,* 336 S.C. 585, 521 S.E.2d 500 (1999). The July letter clearly falls into the exemption under Rule 5. The letter was written to the North Charleston Chief of Police regarding the prosecution of the case. Thus, the July letter was an internal prosecution document and not subject to discovery. *See State v. Gill,* 319 S.C. 283, 460 S.E.2d 412 (1995)(holding that a summary report prepared by police officers for the solicitor's use in prosecuting the case was not subject to discovery), *vacated on other grounds, State v. Gill,* 327 S.C. 253, 489 S.E.2d 478 (1997). In addition, the July letter does not contain any impeachment or exculpatory evidence. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

■ The January letter, on the other hand, was not prepared for the prosecution of the case and thus does not fall under Rule 5, SCRCrimP. However, the January letter is not relevant to the case at hand. The only paragraph regarding Appellant was about the "perp walk." The jury heard evidence that the officers called the media to let them know about the "perp walk," so although the letter might have bolstered the testimony that the police called the media, it had

no independent evidentiary value.  Finally, the letter does not contain any impeachment or exculpatory evidence.  We affirm the trial court's ruling.

### 4.  Dr. Kassin's testimony

█ Dr. Kassin is a psychology professor at Williams College and was qualified in this case as an expert in social psychology.  Dr. Kassin testified about the psychology of confessions and false or coerced confessions.  Appellant alleges that the trial court erred in preventing Dr. Kassin from testifying about specific case studies, in contravention of Rule 702, SCRE, because the testimony would have been helpful to the jury.  We have determined there was no error, and affirm the trial court's ruling.

In the *Jackson v. Denno* hearing, Dr. Kassin testified about the facts of particular cases in Connecticut[4] and Indiana[5] in which people confessed to crimes, but later were exonerated.  Before Dr. Kassin testified before the jury, the solicitor objected to Dr. Kassin testifying about "cases that don't involve this particular case" because they were irrelevant.  The trial judge stated "Just object to the things you want ... let's try to keep it as much as you can to something that fits the facts of this case generally."

Dr. Kassin testified that he reviewed the videotape of the interview that Officer McHale conducted of Appellant on Friday, and that he was concerned that the techniques used by McHale could lead to a coerced confession.  Dr. Kassin testified in great detail about coerced confessions.  However, on redirect when he was asked to give "anecdotal examples of false confession" the judge stated "I'm not going to allow it

---

**4.**  The Connecticut case involved a man whose mother was killed.  The police told the man he failed a polygraph examination, and that the test was infallible.  The man told the police that he could not have killed his mother.  But the interrogator told him that "people black out these sort of things."  The man then said "Well, then I guess I must have done it."

**5.**  The Indiana case involved a man who was accused of killing his daughter and throwing her into a lake.  The man confessed to the police that he clubbed the girl to death, which was consistent with what was known about the crime at the time.  However, when the body was analyzed, it turns out she was stabbed to death, not clubbed to death.  So, the actual confession did not match the facts of the case.

unless you got a case exactly like this." Dr. Kassin went on to say "there's a case in Indiana that's very similar. There's a case in Connecticut . . ." The solicitor objected again.

Despite these objections, the record reflects that in fact Dr. Kassin was allowed to testify about specific cases of false confession. For example, Dr. Kassin testified that there were incidences of people confessing to a "shaken baby" case when the child died of other causes. He testified that sometimes someone confesses to a murder and some time later the victim turns up alive, so no crime was ever committed. Dr. Kassin testified about the "Innocence Project" in which DNA testing has exonerated people convicted of crimes and that 22% of the people had given false confessions. Finally, Dr. Kassin testified that people can give very detailed false confessions. For example, a man accused of killing his mother gave a reason for killing her as well as the thoughts that were going through his head as he killed her. His confession was a documented false confession.

A trial court's ruling "to exclude or admit expert testimony will not be disturbed on appeal absent a clear abuse of discretion." *Mizell v. Glover*, 351 S.C. 392, 570 S.E.2d 176 (2002). Dr. Kassin did testify about specific cases, he just did not use names or say in which state the crime happened. In addition, the Indiana case was so dissimilar that there was no evidentiary value. *See* footnote 5 *supra*. Although the Connecticut case was similar, the trial court did not abuse its discretion in excluding the information. Dr. Kassin was able to testify at length about false and coerced confessions, and he was able to touch briefly on the Connecticut case. However, assuming error in limiting testimony about the Connecticut case, Appellant cannot show prejudice in light of Dr. Kassin's other testimony. *See State v. Johnson*, 334 S.C. 78, 512 S.E.2d 795 (1999)(exclusion of evidence is harmless where cumulative).

## CONCLUSION

We **AFFIRM** the trial court's rulings.

TOAL, C.J., WALLER, BURNETT, JJ., and Acting Justice JOHN W. KITTREDGE, concur.