# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Anthony Anderson, Appellant.

Appellate Case No. 2019-001406

———————

Appeal From Williamsburg County
Clifton Newman, Circuit Court Judge

———————

Opinion No. 5989
Heard September 14, 2022 – Filed June 14, 2023

———————

**AFFIRMED**

———————

Appellate Defender Breen Richard Stevens, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Assistant Attorney General Tommy Evans, Jr., all of Columbia; and Solicitor Ernest A. Finney, III, of Sumter, all for Respondent.

———————

**LOCKEMY, A.J.:** In this criminal matter, Anthony Anderson appeals his convictions for two counts of murder, possession of a weapon during the commission of a violent crime, and aggregate sentence of sixty years' imprisonment. On appeal, Anderson argues the trial court erred by (1) finding he willingly, intelligently, and voluntarily waived his rights against self-incrimination

and to counsel and (2) refusing to admit an unavailable, third party's statement as a hearsay exception.  For the reasons stated below, we affirm.

## FACTS/PROCEDURAL HISTORY

In August 2011, a Williamsburg County grand jury indicted Anderson for the murders of Rosa Lee McCray, his grandmother, and Theward McCray, his uncle, (collectively, Victims) and for the weapon charge.  Anderson proceeded to trial in May 2014.  Prior to trial, Anderson moved to suppress the statement he gave to law enforcement after the shooting on June 5, 2011.  The trial court conducted a pretrial hearing pursuant to *Jackson v. Denno*[1] to determine the admissibility of Anderson's statement.

At the *Jackson v. Denno* hearing, Investigator Neil Frebowitz, of the Horry County Police Department, testified that Horry County law enforcement responded to a call from Joani Burroughs, Anderson's mother, requesting law enforcement come to her home because Anderson came there, crying, and she believed he was delusional.

Investigator Frebowitz stated that after speaking with Williamsburg County law enforcement and learning of Victims' deaths, Horry County law enforcement placed Anderson under arrest.  He recalled he conducted Anderson's interview, which lasted for about an hour, at approximately 6 AM or 6:30 AM.  According to Frebowitz, he read Anderson his *Miranda*[2] rights by using a standard form. Investigator Frebowitz testified Anderson appeared to understand his questions and gave appropriate, clear, and concise responses.  He stated he did not make any promises to Anderson for his statement nor did he threaten or coerce him.  He also stated the interview took place in a relatively comfortable interview room, with only him and Anderson in the room, and he offered Anderson a beverage. According to Investigator Frebowitz, Anderson did not stop the interview or ask for an attorney.  Investigator Frebowitz stated he believed Anderson freely, voluntarily, and knowingly gave his statement.  He further confirmed Court's Exhibit 2 was a transcribed version of Anderson's interview.  Investigator Frebowitz testified that at no point during the interview did Anderson express any delusions or report hearing or seeing anything that was not there.

On cross-examination, Investigator Frebowitz testified he did not recall if he or Anderson checked the boxes on the *Miranda* form but stated protocol was to

---

[1] 378 U.S. 368 (1964).
[2] 384 U.S. 436 (1966).

ensure interviewees understood their rights.  He acknowledged he spoke with and interviewed Burroughs prior to Anderson's interview.  When asked if Burroughs made him aware of Anderson's 1995 accident—when Anderson suffered a significant brain injury—and that she believed Anderson was delusional when he came to her home, Investigator Frebowitz answered affirmatively.  Investigator Frebowitz also acknowledged he was unsure if Anderson had taken his antipsychotic medication prior to speaking with him but stated he did not observe Anderson to be delusional during the interview.

During the June 2011 interview, the following occurred:  Investigator Frebowitz began by giving Anderson a bottle of water and reading Anderson his rights from a *Miranda* advisory form.  He asked Anderson if he understood what he read; Anderson replied that he did and signed the form.  Investigator Frebowitz notified Anderson that he spoke with Burroughs and she told him "a little of what happened."  Anderson confirmed that he called his mother to tell her he was upset with Theward regarding a life insurance policy for which Anderson was the insured.  According to Anderson, Theward would not give him specific information about the policy and Rosa Lee wanted Anderson to repay her the premium amount.  Anderson told Investigator Frebowitz he believed Theward was going to kill him for the insurance proceeds.  When asked about the shootings, Anderson recalled he became angry with Theward over the life insurance policy and obtained a twelve-gauge shotgun from Theward's bedroom closet.  Anderson told Investigator Frebowitz that Theward asked what he was doing with the gun and in response, he shot Theward, who was unarmed, while in the living room.  Anderson further stated that Rosa Lee ran into her bedroom and he followed, kicked open the door, and shot her.  According to Anderson, he "walked right out" after the shootings and threw the gun out his car window as he drove to Burrough's home in Conway.  Anderson could not recall where he threw the gun.  When Investigator Frebowitz recounted the events of the shootings back to Anderson, Anderson answered affirmatively to Investigator Frebowitz's questions.

Anderson also stated during the interview that "[he] messed [his] life up," he made "a big [mistake]," he "[felt] like a failure," and he killed Theward because Theward would often ridicule him.  When Anderson asked if he would be provided counseling, Investigator Frebowitz inquired whether he thought he needed counseling.  Anderson responded he was taking medication to control his temper and, in the past he attended mental health counseling.  Investigator Frebowitz asked Anderson if there was anything else he wished to talk about because he felt "people [did not] talk to [Anderson] much."  When Anderson asked how Victims were doing, Investigator Frebowitz clarified for Anderson that Victims were

deceased and Anderson stated, "[T]hat's two murder charges."  During the interview, Investigator Frebowitz told Anderson he could shut his eyes and get some rest while Investigator Frebowitz stepped out.  At the conclusion of the interview, Investigator Frebowitz explained the next steps of the process to Anderson.

Burroughs testified Anderson came to her home crying and told her to call law enforcement when he arrived at her home after the shooting.  She recounted to police the events of Anderson's 1995 accident, resulting injuries, and treatment.  According to Burroughs, she notified Investigator Frebowitz about Anderson's accident and mental issues.  Burroughs stated she gave Anderson his antipsychotic medication around 5 AM, before Investigator Frebowitz arrived.

Dr. Richard Frierson, a professor of psychiatry with the School of Medicine, testified he did not have an opinion as to whether Anderson was able to understand the *Miranda* warnings he received from Investigator Frebowitz.  He stated that after reviewing the transcribed interview, he believed Anderson "appear[ed] to understand the questions" and gave responsive answers.  Dr. Frierson acknowledged that during the interview, Anderson expressed sentiments consistent with delusional thinking, such as believing Victims planned to kill him to obtain life insurance proceeds.

The State argued Anderson's statement to Investigator Frebowitz was admissible because Anderson's mental deficiencies alone were not enough to make his statements involuntary.  It asserted the evidence showed Anderson was not delusional at the time he gave the statement, and Investigator Frebowitz indicated he had not promised anything to Anderson or coerced him into making the statement.  Finally, the State contended Anderson voluntarily, knowingly, and intelligently waived his *Miranda* rights and gave his statement to Investigator Frebowitz.

In response, Anderson argued that because Investigator Frebowitz was on notice that he suffered from mental deficiencies, Investigator Frebowitz should have taken additional steps to ensure he understood his rights and could knowingly and intelligently waive them.  He contended the questions Investigator Frebowitz asked him were closed and leading.  Anderson asserted that under the totality of the circumstances, Investigator Frebowitz knew he was delusional and knew he could not voluntarily, knowingly, and intelligently waive his *Miranda* rights.

The trial court denied Anderson's motion to suppress, finding that under the totality of the circumstances, Anderson "sufficiently understood the nature of [the]

*Miranda* warnings" and freely and voluntarily gave his statement to Investigator Frebowitz. It also determined there was no coercion by law enforcement. The trial court noted "[t]here [was] always a question . . . whether or not . . . the defendant had the mental ability to understand the implications of *Miranda*" but found the State had met its burden by a preponderance of the evidence.

At trial, Investigator Frebowitz testified similarly as he did during the *Jackson v. Denno* hearing. Anderson renewed his objection to the admission of the statement, and the trial court overruled his objection.

During the State's presentation of its case, Anderson renewed his motion to compel compulsory process of Devin Hedman, a resident of New York.[3] According to Anderson, in December 2012, Hedman provided a statement to the Livingston County Sheriff's Office in New York, confessing to the murders of Victims.[4] Anderson stated he requested the State produce Hedman or, in the alternative, the trial court allow him to admit Hedman's statement into evidence as a hearsay exception under Rule 804(b)(3), SCRE. Anderson acknowledged that while Victims were killed in June 2011 and Hedman claimed to have killed them in July

---

[3] Anderson stated he filed the motion to compel compulsory process in August 2013.

[4] In summary, Hedman's statement contained the following information. Hedman indicated the Livingston County Sheriff's Office arrested him for driving while intoxicated in December 2012, and while being processed, he confessed to the murders of Victims. He stated Livingston County law enforcement informed him of his *Miranda* rights and he voluntarily gave his statement. According to Hedman, in the late 1990s, he and Anderson were arrested and Hedman took the blame for possessing drugs he claimed were Anderson's; he stated he was angry with Anderson for making him take the blame. Hedman stated that in July 2010, he took a bus from Rochester, New York to Kingstree with the intent to kill Anderson. He claimed his friend "Joe" provided him with a handgun and drove him to an area close to Victims' home. When Anderson and Victims arrived at the house, Hedman went inside, picked up a shotgun from in the house, and fired it at Anderson. He believed he shot Rosa Lee through the wall and proceeded to shoot Theward in the chest. Hedman went after Anderson, who ran out of the house, but when he was unable to find Anderson, he threw the shotgun behind a dumpster at the end of the road. He stated Joe then drove him to a bus station in Kingstree and he returned to New York.

2010, the statement otherwise provided "great detail" into the shooting deaths of Victims and exonerated him.

The State asserted the Livingston County Sheriff's Office investigated the claims in Hedman's statement and were told by Hedman's wife that he was in New York when the shootings occurred. The trial court noted the inconsistencies of Hedman's statement with the facts of the case and determined the statement was "something close to wild speculation that attempt[ed] to come close to what occurred." The trial court denied Anderson's motion to compel compulsory process and denied his motion to admit Hedman's statement.

At the conclusion of the State's case, Anderson again sought to compel the State to produce Hedman or be allowed to present Hedman's statement. Anderson proffered the testimonies of Lieutenant Debra Collins and Officer Pamela Wrenn.

During the proffer, Lieutenant Collins, of the Williamsburg County Sheriff's Department, testified she received Hedman's statement from Investigator Jeffery Wiedrick with the Livingston County Sheriff's Office and gave the statement to Officer Wrenn. She stated Investigator Wiedrick investigated Hedman's claims and was told by Hedman's wife that Hedman was in New York in June 2011. According to Lieutenant Collins, details of Hedman's statement were not factually consistent with the investigation of the shootings. She stated Hedman's statement alleged he killed Victims in July 2010 but Victims were killed in June 2011; further, Hedman claimed to have shot Rosa Lee through the wall but there was no evidence of bullet holes in the wall at the scene. Lieutenant Collins noted Hedman claimed to have thrown the shotgun behind a dumpster at the end of the road where Victims' home was located, but she did not see a dumpster at the end of the road when she investigated. Additionally, she testified it was not logical that Hedman claimed to use a shotgun he found in Victims' home when he stated he came to the home with a handgun.

Officer Wrenn testified there was not a dumpster at the end of the road by Victims' house. She stated although Hedman claimed to have returned to New York after the shooting by going to a bus station in Kingstree, she was unaware of a bus station in Kingstree.

Dr. Nicholas Batalis, a forensic pathologist with the Medical University of South Carolina, testified he performed Victims' autopsies. Dr. Batalis stated he performed an internal examination and removed pellets and shotgun wadding from Rosa Lee. He opined the end of the shotgun was three to five feet away from Rosa Lee when it was fired. Dr. Batalis classified Victims' deaths as homicides.

Anderson asserted that pursuant to his constitutional rights, the State was responsible for producing Hedman as an exonerating witness. Alternatively, he argued Hedman's statement was admissible as a hearsay exception because it was a statement against penal interest. He contended the factual issues in Hedman's statement went to credibility and were issues for the jury to determine.

The State argued Anderson made no attempt to subpoena Hedman from New York. In regards to Anderson's alternative, it asserted Anderson did not present any corroboration of Hedman's claims.

The trial court denied Anderson's motion to compel compulsory process of Hedman, finding (1) he made no attempts to utilize the compulsory process procedure under section 19-9-70 of the South Carolina Code (2014); (2) he did not seek a continuance or the trial court's assistance in producing the witness; and (3) he failed to bring the motion to the court's attention in a timely manner. The court noted it was "incumbent upon the parties to bring these matters to the [c]ourt's attention." Additionally, the trial court denied Anderson's motion to admit Hedman's statement, finding there was "no corroborating evidence" and it was not exculpatory based on its untrustworthiness.

During Lieutenant Collins's trial testimony, Anderson again sought to admit Hedman's statement, and the State objected based on hearsay and lack of foundation. The trial court sustained the State's objection.

The jury found Anderson guilty as indicted, and the trial court sentenced him to thirty years' imprisonment for each count of murder and five years' imprisonment for the weapon charge.

Anderson filed a motion for a new trial, arguing the trial court erred by (1) admitting his statement to law enforcement; (2) denying his motion for compulsory process; and (3) failing to allow him to admit Hedman's statement into evidence. The trial court denied Anderson's motion, finding Anderson's arguments were the same issues the court previously ruled on at trial. This appeal followed.

**ISSUES ON APPEAL**

1. Did the trial court err in finding Anderson knowingly, intelligently, and voluntarily waived his rights against self-incrimination and to counsel?

2. Did the trial court err in refusing to allow Anderson to admit Hedman's statement as a statement against penal interest?

**STANDARD OF REVIEW**

In criminal cases, this court sits to review errors of law only and is bound by the trial court's factual findings unless those findings are clearly erroneous. *State v. Wilson*, 345 S.C. 1, 5-6, 545 S.E.2d 827, 829 (2001).

"The trial [court] determines the admissibility of a statement upon proof of its voluntariness by a preponderance of the evidence." *State v. Miller*, 375 S.C. 370, 378, 652 S.E.2d 444, 448 (Ct. App. 2007). "Factual conclusions as to the voluntariness of a statement will not be disturbed on appeal unless so manifestly erroneous as to show an abuse of discretion." *State v. Kirton*, 381 S.C. 7, 25, 671 S.E.2d 107, 116 (Ct. App. 2008). "An abuse of discretion occurs when the ruling is based on an error of law or a factual conclusion that is without evidentiary support." *Id.*

The decision to admit evidence remains in the sound discretion of the trial court, and an appellate court will not disturb such a ruling absent an abuse of that discretion. *State v. Barnes*, 421 S.C. 47, 53-54, 804 S.E.2d 301, 305 (Ct. App. 2017). "An abuse of discretion standard is applied to a trial [court's] ruling on the issue of whether a statement is admissible as a declaration against penal interest." *State v. Kinloch*, 338 S.C. 385, 388, 526 S.E.2d 705, 706 (2000).

**LAW/ANALYSIS**

### I. Anderson's Statement to Law Enforcement

Anderson argues the trial court erred in admitting his statement into evidence. He asserts that under the totality-of-the-circumstances, he did not knowingly, intelligently, and voluntarily waive his rights against self-incrimination and to counsel. Anderson suggests that because Investigator Frebowitz was aware of his prior injury and mental deficiencies, Investigator Frebowitz was required to take additional precautions to ensure Anderson understood his rights and their waiver. According to Anderson, his actions during the interview, such as his stuttered speech, multiple references to his belief that Victims were planning to kill him, him falling asleep when Investigator Frebowitz left the room, and his "non-sensical" responses, established that he failed to understand the circumstances of the interview and his rights. We disagree.

"A confession is not admissible unless it was voluntarily made." *State v. Myers*, 359 S.C. 40, 47, 596 S.E.2d 488, 492 (2004). "If a defendant was advised of his *Miranda* rights, but chose to make a statement anyway, the 'burden is on the State to prove by a preponderance of the evidence that his rights were voluntarily

waived.'" *State v. Collins*, 435 S.C. 31, 43, 864 S.E.2d 914, 920 (Ct. App. 2021) *cert. granted* (Dec. 15, 2022) (quoting *State v. Childs*, 299 S.C. 471, 475, 385 S.E.2d 839, 842 (1989)). "The State bears this burden of proof even [when] a defendant has signed a waiver of rights form." *Id.*

"Under *Jackson v. Denno*, [a defendant] is entitled to a reliable determination as to the voluntariness of his confession by a tribunal other than the jury charged with deciding his guilt or innocence." *State v. Fortner*, 266 S.C. 223, 226, 222 S.E.2d 508, 510 (1976). "In South Carolina, the test for determining whether a defendant's confession was given freely, knowingly, and voluntarily focuses upon whether the defendant's will was overborne by the totality of the circumstances surrounding the confession." *State v. Moses*, 390 S.C. 502, 513, 702 S.E.2d 395, 401 (Ct. App. 2010). "The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *Miller*, 375 S.C. at 384, 652 S.E.2d at 451 (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). "Appellate entities in South Carolina have recognized that appropriate factors to consider in the totality-of-circumstances analysis include: background, experience, and conduct of the accused; age; length of custody; police misrepresentations; isolation of a minor from his or her parent; threats of violence; and promises of leniency." *Id.* at 386, 652 S.E.2d at 452 (quoting *Childs*, 299 S.C. at 475, 385 S.E.2d at 842).

"Absent coercive police conduct causally related to a confession, there is no basis for finding a confession constitutionally involuntary. A defendant's mental condition in and of itself does not render a statement involuntary in violation of due process." *State v. Hughes*, 336 S.C. 585, 594, 521 S.E.2d 500, 505 (1999). "[U]nder State law, a confession is not inadmissible because of mental deficiency alone." *Id.*

"On appeal, the trial [court's] ruling as to the voluntariness of the confession will not be disturbed unless so erroneous as to constitute an abuse of discretion." *Myers*, 359 S.C. at 47, 596 S.E.2d at 492. "When reviewing a trial court's ruling concerning voluntariness, this [c]ourt does not reevaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence." *State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001).

In *Collins*, this court found a trial court abused its discretion in finding a defendant voluntarily gave his statement to law enforcement and determined it improperly admitted the statement into evidence. *Collins*, 435 S.C. at 54, 864 S.E.2d at 926. There, Collins received his *Miranda* warnings but the interviewing officers

subsequently told him any statement he made would not be used against him. *Id.* at 51, 864 S.E.2d at 924. Additionally, law enforcement officers told Collins they only sought information to prosecute the co-defendant; they were there to assist Collins; that "no matter what he told them, [Collins] was going to get to go home after the interview"; and if he did not cooperate, they would seek to prosecute him. *Id.* at 52, 864 S.E.2d at 925. This court also noted that Collins suffered from an intellectual deficit. *Id.* at 53, 864 S.E.2d at 925. It found, under the totality-of-the-circumstances, including Collins's characteristics and the details of the interrogation, law enforcement had overborne Collins's will and induced him into making the inculpatory statement. *Id.* This court reversed Collins's convictions and remanded for a new trial. *Id.* at 55, 864 S.E.2d at 926.

We hold the trial court did not abuse its discretion in admitting Anderson's statement. *See Wilson*, 345 S.C. at 5-6, 545 S.E.2d at 829 (stating that "[i]n criminal cases, the appellate court sits to review errors of law only" and it is "bound by the trial court's factual findings unless they are clearly erroneous"); *Kirton*, 381 S.C. at 25, 671 S.E.2d at 116 ("An abuse of discretion occurs when the ruling is based on an error of law or a factual conclusion that is without evidentiary support."). We find evidence supports the trial court's finding that Anderson voluntarily, knowingly, and intelligently gave his statement. *See Saltz*, 346 S.C. at 136, 551 S.E.2d at 252 ("When reviewing a trial court's ruling concerning voluntariness, this [c]ourt does not reevaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence.").

Although Anderson argues his mental deficiency made the waiver of his rights and subsequent statement involuntary, based on South Carolina law, Anderson's mental deficiency alone was not enough to render his statement to law enforcement involuntary. *See Miller*, 375 S.C. at 385, 652 S.E.2d at 452 (stating the mental condition of the suspect is one factor to consider in the totality-of-the-circumstances analysis to determine the voluntariness of a statement); *Hughes*, 336 S.C. at 594, 521 S.E.2d at 505 ("A defendant's mental condition in and of itself does not render a statement involuntary in violation of due process."); *id.* ("[U]nder State law, a confession is not inadmissible because of mental deficiency alone.").

We also find Investigator Frebowitz did not employ coercive tactics to obtain Anderson's statements. *See Miller*, 375 S.C. at 386, 652 S.E.2d at 452 ("Coercive police activity is a necessary predicate to finding a statement is not voluntary."); *Hughes*, 336 S.C. at 594, 521 S.E.2d at 505 ("Absent coercive police conduct causally related to a confession, there is no basis for finding a confession

constitutionally involuntary.").  First, prior to discussing the events surrounding Victims' deaths, Investigator Frebowitz read Anderson his *Miranda* rights, asked if he understood them, and utilized a *Miranda* rights form, which Anderson signed. *See Miller*, 375 S.C. at 386, 652 S.E.2d at 452 (stating that a factor to consider in the totality analysis is whether law enforcement advised the accused of his right to remain silent and right to have counsel present).  Second, he stated the interview room was relatively comfortable, he was the only other person present, and he ensured Anderson had a beverage.  *See id.* (stating a factor to consider in the totality analysis is the location of the interview).  Third, Anderson did not stop the interview or ask for an attorney at any point in time.  Finally, the circumstances surrounding Anderson's confessions do not show that his statement was the product of an oppressive and coercive environment.  *See id.* ("Coercive police activity is a necessary predicate to finding a statement is not voluntary.").  Investigator Frebowitz testified he did not make any promises to Anderson and he did not threaten or coerce him.  Moreover, he stated the interview lasted approximately one hour and Anderson appeared to understand his questions and gave appropriate, clear, and concise responses.

Furthermore, Anderson failed to provide evidence establishing coercive behavior on law enforcement's part, generally, or law enforcement's actions being coercive given his mental deficiencies, specifically.  Unlike the appellant in *Collins*, who also suffered from a mental deficiency, Anderson failed to show any coercive behavior on law enforcement's part that, given his mental deficiency and under the totality, would have caused his will to be overborne and rendered his statement involuntary.  *Collins*, 435 S.C. at 53, 864 S.E.2d at 925.  Additionally, while not dispositive under the totality test, Anderson did not provide any expert witnesses who testified to the impact his mental deficiencies had on his ability to comprehend and voluntarily waive his rights.  *See Miller*, 375 S.C. at 386, 652 S.E.2d at 452 ("Coercion is determined from the perspective of the suspect.").

Thus, we hold the trial court did not abuse its discretion by finding Anderson voluntarily, knowingly, and intelligently waived his rights and gave his statement. Accordingly, we affirm as to this issue.

## II.    Admissibility of Hedman's Statement[5]

---

[5] Although Anderson argues the State should have brought his pending motion for compulsory process to the attention of the trial court sooner, the State had no such obligation.  Further, nothing prevented Anderson from requesting a hearing on the motion before trial.  *See* § 19-9-70 (outlining the procedure for securing the

Anderson argues the trial court erred in excluding Hedman's statement because the statement was admissible as a hearsay exception against penal interest. He contends the trial court erred in reviewing the truth of Hedman's statement rather than only reviewing the making of the statement. Anderson argues that though the trial court characterized Hedman's statement as "wild speculation," accurate information in the statement supported its truthfulness. According to Anderson, the statement accurately described the people in the house, the house itself, the murder weapon, and Theward's wounds. Anderson asserts the circumstances surrounding Hedman's statement "were clearly corroborative" of the statement because Hedman was aware of his *Miranda* rights and confessed to law enforcement of committing a double murder. He also argues the testimonies of Lieutenant Collins and Officer Wrenn supported the foundation for admitting the statement as an authenticated business record. We disagree.

Hearsay is an out-of-court statement made to prove the truth of the matter asserted. Rule 801(c), SCRE. Generally, hearsay is not admissible. Rule 802, SCRE. However, the Rules of Evidence permit hearsay to be admitted "if the declarant is unavailable as a witness" and the "statement which was at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Rule 804(b)(3), SCRE. However, "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Rule 804(b)(3).

"A defendant seeking to offer a statement pursuant to this exception bears the 'formidable burden' of establishing that corroborating circumstances clearly indicate the trustworthiness of the statement." *State v. Wannamaker*, 346 S.C. 495, 501, 552 S.E.2d 284, 287 (2001). "The rule does not require that the information within the statement be clearly corroborated, it means only that there be corroborating circumstances which clearly indicate the trustworthiness of the

---

testimony of a material, out-of-state witness through the courts of states that have also adopted the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings); N.Y. Crim. Proc. Law § 640.10 (McKinney, 2012) (New York's codification of the reciprocal Uniform Act to Secure Attendance of Witnesses from Without a State in Criminal Cases); Rule 13, SCRCrimP (allowing for the issuance of a subpoena or subpoenas duces tecum by an officer of the court and requiring the person subpoenaed to attend as a witness in the General Sessions Court).

statement itself, i.e., that the statement was actually made." *State v. Cope*, 405 S.C. 317, 342-43, 748 S.E.2d 194, 207 (2013). Our supreme court has recognized that "[i]n many instances, it is not possible to separate these two considerations in analyzing the matter of corroboration." *Id.* at 343, 748 S.E.2d at 207 (alteration in original) (quoting *State v. McDonald*, 343 S.C. 319, 324, 540 S.E.2d 464, 466 (2000)). "[T]he two inquiries are related, ordinarily requiring the trial court to examine the content of the statements as part of its analysis of the totality of the circumstances." *McDonald*, 343 S.C. at 324 n.5, 540 S.E.2d at 466 n.5. "Whether a statement has been sufficiently corroborated is a question 'left to the discretion of the trial judge "after considering the totality of the circumstances under which a declaration against penal interest was made."'" *Wannamaker*, 346 S.C. at 501, 552 S.E.2d at 287 (quoting *McDonald*, 343 S.C. at 323, 540 S.E.2d at 466).

We hold evidence supports the trial court's determination to exclude Hedman's statement because the statement was uncorroborated. *See Kinloch*, 338 S.C. 385, 388, 526 S.E.2d 705, 706 ("An abuse of discretion standard is applied to a trial [court's] ruling on the issue of whether a statement is admissible as a declaration against penal interest."); *Wannamaker*, 346 S.C. at 501, 552 S.E.2d at 287 ("Whether a statement has been sufficiently corroborated is a question 'left to the discretion of the trial judge "after considering the totality of the circumstances under which a declaration against penal interest was made."'"). Here, the trial court determined there were factual inconsistencies with Hedman's statement, found his statement amounted to "wild speculation that attempt[ed] to come close to what occurred," and concluded Anderson failed to provide the required corroborating evidence to support admitting the statement.

Determining whether Anderson provided evidence clearly corroborating Hedman's statement to deem it admissible under Rule 804(b)(3) requires analyzing two related inquires—the context of the statement and the content of the statement. *See* Rule 804(b)(3) ("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."); *McDonald*, 343 S.C. at 324 n.5, 540 S.E.2d at 466 n.5 ("[T]he two inquiries are related, ordinarily requiring the trial court to examine the content of the statements as part of its analysis of the totality of the circumstances."). We find Anderson did not clearly corroborate Hedman's statement to allow for its admission at trial. *See Wannamaker*, 346 S.C. at 501, 552 S.E.2d at 287 ("A defendant seeking to offer a statement pursuant to this exception bears the 'formidable burden' of establishing that corroborating circumstances clearly indicate the trustworthiness of the statement.").

While certain assertions from Hedman's statement were similar to the events surrounding the deaths of Victims, such as the location of the shooting, the weapon used, and the color of Victims' home, other assertions were inconsistent with the facts of the case. Lieutenant Collins testified that in his statement, Hedman claimed to have (1) killed Victims in July 2010; (2) shot Rosa Lee through a wall; and (3) thrown the weapon behind a dumpster at the end of the road. Highlighting the inconsistencies in Hedman's statement, Lieutenant Collins explained (1) Victims were killed in June 2011, (2) there was no evidence of bullet holes in the wall at Victims' home, and (3) there was no dumpster at the end of the road where Hedman claimed he threw the weapon. She further indicated Hedman's wife told New York law enforcement he was living and working in New York in June 2011. Officer Wrenn also testified there was not a dumpster at the end of the road, and though Hedman stated he returned to New York by taking a bus from the station in Kingstree, she was unaware of a bus station in Kingstree. Furthermore, Dr. Batalis's testimony did not establish that Rosa Lee was shot through a wall; instead, he opined the shooter was three to five feet away, close enough that shell wadding from the shotgun was lodged inside of her. Accordingly, because there is evidence to support the trial court's decision to deny admitting Hedman's statement, we hold the trial court did not abuse its discretion.

We do not address Anderson's argument as to whether there was a proper foundation for admitting Hedman's statement because the determination that Anderson failed to establish the statement's admissibility under Rule 804(b)(3) is dispositive. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (observing an appellate court need not address remaining issues when the determination of another point is dispositive). Thus, we affirm this issue.

**CONCLUSION**

For the foregoing reasons, Anderson's convictions are

**AFFIRMED.**

**WILLIAMS, C.J., and THOMAS, J., concur.**